**UNITED STATES of America**

v.

**BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.**

**Crim. Action No. 91–0655(JHG).**

United States District Court, District of Columbia.

Sept. 20, 1996.

U.S. Department of Justice, Lee J. Radek, Director, Asset Forfeiture Office, Criminal Division, Stefan D. Cassella, Trial Attorney, J. Christopher Kohn, Director, Commercial Litigation Branch, Civil Division, John T. Stemplewicz, Trial Attorney, Karen I. Meyer, Trial Attorney, for the Government.

Benito Romano, Joseph T. Baio, John J. Halloran, Jr., Willkie Farr & Gallagher, Washington, DC, for American Express Bank Ltd.

John L. Warden, H. Rodgin Cohen, Richard H. Klapper, Penny Shane, Sullivan & Cromwell, Washington, DC, amicus curiae Counsel for New York Clearing House Association.

### MEMORANDUM OPINION AND ORDER DENYING MOTION TO DISMISS

JOYCE HENS GREEN, District Judge.

Presently before the Court is the United States' Motion to Dismiss ("Motion to Dismiss") the Petition of American Express Bank, Ltd., Pursuant to 18 U.S.C. § 1963(*l*) (1994) ("L–Claim"). The question presented is whether a bank's right of set off against a depositor's general accounts, unexecuted at the time the accounts were seized by banking regulators, creates a legal interest sufficient to establish standing under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Pub.L. No. 91–452, 84 Stat. 941 (1970), as amended, codified at 18 U.S.C. §§ 1961–1968 (1994). American Express Bank, Ltd., seeks to set off debts in the amount of $23,537,303 owed to it by the Bank of Credit and Commercial International ("BCCI").[1] For the reasons expressed be-

---

1. "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company

low, the Motion to Dismiss will be denied, and in accordance with 18 U.S.C. § 1963($l$)(5), a hearing will be held on the validity and sufficiency of the interests asserted in American Express Bank's L–Claim.

## Background

The facts surrounding BCCI's collapse are well known in the financial and legal communities, but certain facts bear repeating to set the stage for resolving the government's pending motion to dismiss. In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and treasury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with banking regulators in other countries. Based upon that audit and independent domestic investigations, on July 5, 1991, regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks seized BCCI's assets at various New York banks, including those at American Express Bank. By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and as of July 29, 1991, forty-four countries had closed down BCCI branches.

On November 15, 1991, a three-count Indictment charging BCCI with conspiracy, wire fraud and racketeering was filed in this Court. On January 24, 1992, following findings of fact and conclusions of law with sup-porting reasons made in open court, this Court accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. *See* Transcript of Guilty Plea Proceedings, at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, the Court then entered an Order of Forfeiture.

Under paragraph 9 of the Plea Agreement, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order, this included BCCI's ownership interests in all real property, tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates). Attached to the Order of Forfeiture, as amended, was a list of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith.

At the time the Court entered the Order of Forfeiture, it was understood that the United States had been unable to identify all of BCCI's assets in the United States. Accordingly, the United States later petitioned the Court to amend the Order of Forfeiture to add the subsequently identified assets. The Court granted the United States' first request to amend the Order of Forfeiture and issued the First Supplemental Order on January 31, 1992. This Order directed the immediate seizure of the specific assets listed therein. Included among the assets seized at American Express Bank were account # 703876 and a brokerage account (number unknown), including offsets taken from those accounts.[2]

---

(Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

**2.** American Express Bank claimed a set off of $23,037,303 from BCCI account # 703876 and $500,000 from the brokerage account. *See* L–Claim, at ¶ 21.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement, at ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court-Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund is more specific. In addition to allowing for reimbursement of the costs of investigation and prosecution of BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court-Appointed Fiduciaries to innocent worldwide victims of BCCI." *Id.* ¶ 12(f). As a result of BCCI's guilty plea and the subsequent criminal forfeiture proceedings the United States has "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099, *5 (F.D.C.H.).[3]

On February 14, 1992, pursuant to the amended Order of Forfeiture, American Express Bank transferred over $119 million to the United States Marshals Service. This amount represented what American Express Bank contended was the balance (or net) in BCCI's account after the bank set off $23,-537,303 for debts that it claimed BCCI owed. After withholding the set off amount, American Express Bank filed a motion for a temporary restraining order and requested a pre-seizure hearing.

The Court granted American Express Bank's request for a hearing, but rejected its arguments. Thereafter, American Express Bank transferred the remaining amount of $23,537,303 to the United States Marshal on March 10, 1992. Through the instant L-Claim, American Express Bank claims title to, and seeks the return of $23,537,303, contending that it owned this sum pursuant to lawful set offs taken against BCCI before the Order of Forfeiture was entered.

The set offs arise from a series of foreign currency exchange transactions between American Express Bank and BCCI between July 2–5, 1991, and from an uncollateralized loan that American Express Bank made to BCCI on April 25, 1991. The currency transactions were to be accomplished on or before July 5, 1991,[4] but before they were completed, banking regulators froze BCCI's assets, including those at American Express Bank. At the time of the seizure, BCCI owed American Express Bank approximately $13,000,000 as a result of the foreign currency transactions. In addition, on July 8, 1991, BCCI's obligation came due to pay $10,052,-743 on the uncollateralized loan of April 25, 1991. When BCCI failed to pay the amounts owed on July 8th, American Express Bank "exercised its right of set off as to the $22,-848,928 in obligations owed to [American Express Bank] by BCCI." Affidavit of Farhad Subjally, ¶ 4 (July 21, 1992). On July 15, 1991, American Express Bank set off $500,-000 arising from foreign currency obligations, and on July 23, 1991, the bank set off $188,-375 "arising from the need to secure cover in the open market." *Id.; see* L-Claim, *supra,* at ¶ 24.

American Express Bank now petitions the Court to amend the Order of Forfeiture to

---

3. In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. *See* Notice to the Court, at 1 (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24. *Id.* at 2.

4. *See* L-Claim, *supra,* at ¶¶ 24 & 25 (describing transactions and stating that "[i]n connection with the foregoing transactions, American Express Bank provided BCCI valuable consideration but failed to receive from BCCI in excess of $13,484,560.").

exclude the $23,537,303 set off amount, and the United States has moved to dismiss the petition. The parties have fully briefed the issues underlying the petition, and they have submitted multiple memoranda debating the application of supplemental authority.[5] Oral argument has been held, and the pending motion is ripe for resolution.

## Discussion

BCCI's assets were forfeited pursuant to 18 U.S.C. § 1963,[6] which sets forth an orderly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims.[7] It permits any person, other than the defendant, claiming a legal interest in forfeited property to petition the Court for a hearing to adjudicate the validity of that interest. 18 U.S.C. § 1963($l$)(2).[8] Section 1963($l$)(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest

was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination. 18 U.S.C. § 1963($l$)(6).

 However, a petitioner must first establish standing. Only by establishing standing and alleging the requisite elements of either § 1963($l$)(6)(A) or § 1963($l$)(6)(B) may a party obtain judicial relief from an order of forfeiture. *See United States v. BCCI Holdings (Luxembourg), S.A., et al.,* 833 F.Supp. 9, 13 (D.D.C.1993), *aff'd,* 46 F.3d 1185, 1188 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States,* — U.S. —, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); *United States v. Schwimmer,* 968 F.2d 1570, 1584 (2d Cir. 1992); *United States v. Lavin,* 942 F.2d 177, 187 (3d Cir.1991). If a third party fails to allege in its petition all elements necessary

---

**5.** The New York Clearing House Association also filed an *amicus* brief, which was of aid to the Court in resolving this motion.

**6.** 18 U.S.C. § 1963(a) provides, in relevant part:

Whoever violates any provision of section 1962 of this chapter shall ... forfeit to the United States, irrespective of any provision of State law—
(1) any interest the person has acquired or maintained in violation of section 1962;
(2) any—
(A) interest in;
(B) security of;
(C) claim against; or
(D) property or contractual right of any kind affording a source of influence over;
any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and
(3) any property constituting, or derived from, any proceeds which the person has obtained directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order ... that the person forfeit to the United States all property described in this subsection.

**7.** Title 18 U.S.C. § 1963($l$)(6) contains exactly the same language as 21 U.S.C. § 853(n)(6), the statute providing for forfeiture in criminal narcotics cases, and it appears that no court has interpreted these two provisions differently. Because the two subsections are identical and because of the relative dearth of case law interpreting and applying § 1963($l$), the Court's opinion relies on reasoning contained in § 853(n) cases as well as in § 1963($l$) cases.

**8.** This provision provides:

Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

for recovery—including those relating to standing—the court may dismiss the petition without providing a hearing. *See United States v. Campos,* 859 F.2d 1233, 1240 (6th Cir.1988); *United States v. Mageean,* 649 F.Supp. 820, 825 (D.Nev.1986), *aff'd without opinion,* 822 F.2d 62 (9th Cir.1987); S.Rep. No. 225, 98th Cong., 1st Sess. 191, 208 n. 46 (Sept. 12, 1983).

The parties contest whether American Express Bank has standing. While American Express Bank is both a creditor and debtor of BCCI, *see Aspen Indus. v. Marine Midland Bank,* 52 N.Y.2d 575, 582 n*, 421 N.E.2d 808, 812 n.*, 439 N.Y.S.2d 316, 320 n* (N.Y.1981), the parties dispute whether American Express Bank was a secured creditor. When BCCI deposited $150,000,000 with American Express Bank in a general account, the bank assumed absolute title to the funds and, in return, BCCI was left with a chose in action or a right to demand payment. *See New York County National Bank v. Massey,* 192 U.S. 138, 147, 24 S.Ct. 199, 201, 48 L.Ed. 380 (1904); *Jefferson Bank and Trust v. United States,* 894 F.2d 1241, 1243–44 (10th Cir.1990); *United States v. Citizens & Southern Nat. Bank,* 538 F.2d 1101, 1105 (5th Cir.1976), *cert. denied,* 430 U.S. 945, 97 S.Ct. 1579, 51 L.Ed.2d 792 (1977). Money is fungible, *see United States v. Moore,* 27 F.3d 969, 976 (4th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 459, 130 L.Ed.2d 367 (1994), and BCCI had no right to the specific funds that it originally deposited. While assuming no responsibility as to the specific funds deposited, American Express Bank became BCCI's debtor and assumed a liability to pay subject to BCCI's demand. American Express Bank was BCCI's creditor by virtue of the loan agreement and the foreign currency exchange transactions.

Conceding that the set offs were taken against general accounts, that the loan was uncollateralized, and that no contract or agreement expressly provided for set off using the relevant BCCI accounts, American Express Bank nevertheless claims that it has a specific interest in taking a credit (through the set offs) against its liabilities to BCCI. This credit, in effect a post-freeze transfer of $23.5 million to American Express Bank, is the property interest over which the parties now do battle.

▪ The government argues that American Express Bank, like Credit Suisse and Industrial Bank of Japan in *United States v. BCCI Holdings (Luxembourg), S.A., et al.,* 833 F.Supp. 22 (D.D.C.1993), is merely an unsecured (or general) creditor of BCCI. *See* Motion to Dismiss, at 4–5; Transcript of Hearing ("TR"), at 53 (Feb. 14, 1994). It is undisputed that the BCCI accounts were neither special accounts nor pledged as collateral, and according to the government, American Express Bank's untimely attempt to set off the funds is insufficient to establish a security interest. Since general creditors cannot assert interests in specific assets, they cannot assert a legal right, title, or interest in property that has been ordered forfeited. 833 F.Supp. at 26 (citing *United States v. Reckmeyer,* 836 F.2d 200, 206 n. 3 (4th Cir. 1987)). Thus, the government contends that, as an unsecured creditor, American Express Bank lacks standing to contest the forfeiture and the petition should therefore be dismissed.

American Express Bank responds that it is differently situated than were Credit Suisse and International Bank of Japan. As BCCI's depository bank, it enjoyed a right of set off under New York law, and it "treated BCCI's deposits as security." Memorandum in Opposition, at 15; TR at 60. It follows, according to American Express Bank, that the bank's statutory right to set off BCCI's debts made it a secured creditor of BCCI. *Id.* at 5; TR at 64.

The issue thus framed is simply whether the right of set off, exercised *after* BCCI's assets were frozen by banking regulators, is sufficient to transform American Express Bank into a secured creditor for the purposes of conferring standing under 18 U.S.C. § 1963(*l* ).

▪ The right of set off is an ancient concept rooted in Roman procedural law, *see generally* Michael E. Tigar, *Automatic Extinction of Cross–Demands:* Compensatio *from Rome to California,* 53 Cal.L.Rev. 224 (1965), and it reflects the common sense prin-

ciple that mutual debts should be extinguished extrajudicially. *Id.* at 225; *see also Citizens Bank of Maryland v. Strumpf,* — U.S. —, —, 116 S.Ct. 286, 289, ·133 L.Ed.2d 258 (1995). The right of set off is generally equitable in origin, but it may also be established by statute. To exercise the equitable right of set off against a depositor's general account, the debts sought to be offset must be the matured debts of the depositor. *See generally* Barkley Clark & Barbara Clark, The Law of Bank Deposits, Collections and Credit Cards, ¶ 18.01, at 18–18 (1995); John TeSelle, *Banker's Right of Set off—Banker Beware,* 34 Okla.L.Rev. 40, 42 (1981). In New York, the right of set off has been established by statute, N.Y. Creditor and Debtor Law § 151,[9] and it is this statute that primarily concerns us here.

■ It is well established that a set off is not self-executing; to be effective, the bank must take affirmative steps to establish and memorialize its interest. *Strumpf,* — U.S. at —, 116 S.Ct. at 289; *United States v. Sterling National Bank & Trust Co. of New York,* 494 F.2d 919, 922 (2d Cir.1974); *see also United States v. Cache Valley Bank,* 866 F.2d 1242, 1244 (10th Cir.1989); *State Bank of Fraser v. United States,* 861 F.2d 954, 960 (6th Cir.1988); *United States v. Central Bank of Denver,* 843 F.2d 1300, 1309–10 (10th Cir.1988); *Peoples Nat. Bank of Washington v. United States,* 777 F.2d 459, 462 (9th Cir.1985); *Citizens & Southern*

*Nat. Bank,* 538 F.2d at 1106–07; *Matter of Penn Central Transp. Co.,* 458 F.Supp. 1234, 1328–29 (E.D.Pa.1978), *aff'd in part,* 596 F.2d·1102 (3d Cir.), *cert. denied,* 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979). *See generally* 5A Michie on Banks and Banking, § 114, at 431 (1994); Clark & Clark, *supra,* at ¶ 18.09[1], at 18–42. Moreover, "[b]ank deposits do not constitute either a security in the normal legal sense of that term, or the functional equivalent of security," 5A·Michie on Banks and Banking, § 114, at 430–31, and the "right of set off is not a security interest and has never been confused with one." 1 Gilmore, Security Interests in Personal Property, § 10.7, at 315–16 (1965). Where a set off is not timely executed, it simply does not create a security interest. *E.g., Jersey State Bank v. United States,* 926 F.2d 621, 623 (7th Cir.1991) (against federal tax lien); *Jefferson Bank and Trust,* 894 F.2d at 1243–44 (same); *Cache Valley Bank,* 866 F.2d at 1244 (same); *State Bank of Fraser,* 861 F.2d at 960 (same); *Katz v. First Nat. Bank of Glen Head,* 568 F.2d 964, 973 (2d Cir.1977) (Van Graaefeiland, C.J., concurring in part and dissenting in part) (same), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978); *Sterling National Bank,* 494 F.2d at 922 (same); *see also Matter of Penn Central Transp. Co.,* 458 F.Supp. at 1328–29 (untimely set off insufficient in the context of a reorganization petition).

9. Section 151 provides:

Every debtor shall have the right upon:

(a) the filing of a petition under any of the provisions of the federal bankruptcy act or amendments thereto or the commencement of any proceeding under any foreign bankruptcy, insolvency, debtor relief or other similar statute or body of law, by or against a creditor:

(b) the making of an assignment by a creditor for the benefit of its creditors;

(c) the application for the appointment, or the appointment, of any receiver of, or any of the property of a creditor;

(d) the issuance of any execution against any of the property of a creditor;

(e) the issuance of a subpoena or order, in supplementary proceedings, against or with respect to any of the property of a creditor; or

(f) the issuance of a warrant of attachment against any of the property of a creditor,

to set off and apply against any indebtedness, whether matured or unmatured, of such creditor to such debtor, any amount owing from

such debtor to such creditor, at or at any time after, the happening of any of the above mentioned events, and the aforesaid right of set off may be exercised by such debtor against such creditor or against any trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receiver or execution, judgment or attachment creditor of such creditor, or against one else claiming through or against such creditor or such trustee in bankruptcy, debtor in possession, assignee for the benefit of creditors, receivers, or execution, judgment or attachment creditor, notwithstanding the fact that such right of set off shall not have been exercised by such debtor prior to the making, filing or issuance, or service upon such debtor of, or of notice of, any such petition; assignment·for the benefit of creditors; appointment or application for the appointment of a receiver; or issuance of execution subpoena or order or warrant.

N.Y.Debtor and Creditor Law § 151 (McKinney 1990).

In the instant claim, the government asserts that American Express Bank's attempted set off was ineffective because, prior to the freeze of BCCI's accounts on July 5, 1991, BCCI's debts were not mature. Section 151, however, dictates a different result. The application for receivership filed by the United Kingdom on July 5, 1991 triggered Section 151.[10] *See* Winding–Up Petition, In the Matter of Bank of Credit and Commerce International S.A., et al., (July 5, 1991), attached as Exhibit C to Affidavit of Benito Romano (July 31, 1992) (affidavit submitted in response to motion to dismiss). Once operative, Section 151 allowed American Express Bank to set off BCCI's debts, whether matured or unmatured. The relevant question is not whether BCCI's debts were mature, but whether American Express Bank could take its set offs after the Superintendent of Banks took possession of BCCI's assets under N.Y. Banking Law §§ 606, 615 (McKinney 1990). For the reasons expressed below, under New York law a bank's right of set off is not so barred.[11]

■ While the right of set off is not absolute, in New York the statutory right of set off is jealously protected. Two cases demonstrate its cherished status. In *Matter of Industrial Commissioner of the State of New York v. Five Corners Tavern,* 47 N.Y.2d 639, 646, 393 N.E.2d 1005, 1009, 419 N.Y.S.2d 931, 935 (N.Y.1979), the Court of Appeals construed Section 151 to preserve a right of set off even though the set off was taken *after* the State Industrial Commissioner served a tax compliance warrant, garnishing unpaid unemployment insurance contributions in a depositor's account. Reversing the Appellate Division, which had relied upon *Sterling,* 494 F.2d at 922, the Court of Appeals concluded that the untimely set off was nevertheless effective, due to the plain language of Section 151: "the aforesaid right of set off may be exercised by such debtor against such credi-

tor ... notwithstanding the fact that such right of set off shall not have been exercised by such debtor prior to the making, filing or issuance, or service upon such debtor of, or notice of ... issuance of execution, subpoena, or order or warrant." 47 N.Y.2d at 645, 393 N.E.2d at 1007–08, 419 N.Y.S.2d at 934 (quoting Section 151). The Court of Appeals reasoned that, by enacting Section 151, the legislature intended to "preserve the right of a garnishee to interpose against executing judgment creditors, even subsequent to the 'issuance of execution,' any right to set off the garnishee may have possessed against the judgment debtor." *Id.,* 393 N.E.2d at 1008, 419 N.Y.S.2d at 934. Limiting the availability of Section 151 to the time before execution would "deprive a garnishee of its opportunity to assert its right of set off against a creditor, a result clearly not intended by the Legislature." *Id.* at 646, 393 N.E.2d at 1008, 419 N.Y.S.2d at 935. The court distinguished *Sterling* as a case in which a conflict between federal tax laws and Section 151 was resolved as a matter of federal supremacy. *See id.,* 393 N.E.2d at 1009, 419 N.Y.S.2d at 935; *see also Matter of the Industrial Commissioner of the State of New York v. South Shore Amusements, Inc.,* 55 A.D.2d 141, 145–46, 389 N.Y.S.2d 850, 852–53 (N.Y.App.Div.1976) (Lane, J., dissenting) (distinguishing *Sterling* ); *The Survey of New York Practice: Article 52—Enforcement of Money Judgments,* 51 St. John's L.Rev. 651–55 (1977) (same).

Standing alone, *Five Corners Tavern* would be distinguishable because it involved a loan agreement in which the bank received set off rights as a security interest in a specific account. *See* 47 N.Y.2d at 643, 393 N.E.2d at 1006, 419 N.Y.S.2d at 933. However, two years later, in *Aspen Industries, Inc. v. Marine Midland Bank,* 52 N.Y.2d 575, 582, 421 N.E.2d 808, 812, 439 N.Y.S.2d 316, 320 (N.Y.1981), the Court of Appeals

---

**10.** The government has not contested whether the United Kingdom's Winding-up Petition was sufficient to trigger Section 151.

**11.** Although the right of set off may be validly exercised after the Superintendent's intervention under New York law, the result would not be the same if American Express Bank had attempted to take a set off in the face of a restraining order

under 18 U.S.C. § 1963(d). The issue of standing presented in the instant L–Claim only requires this Court to construe several state laws simultaneously, not to referee a clash between state and federal law. *See, e.g., Aurora Maritime v. Abdullah Mohamed Fahem & Co.,* 85 F.3d 44, 48 (2d Cir.1996); *Sterling,* 494 F.2d at 922.

extended *Five Corners Tavern* to set offs taken under Section 151 against a depositor's general account. "In short, this statute confers upon a garnishee a right to set off any debt owed to it by a judgment debtor. This right of set off, we have said, is superior to the rights of intervening judgment creditors and may be exercised even after the judgment creditor has undertaken enforcement of his claim against the judgment debtor." *Id.*, 421 N.E.2d at 812, 439 N.Y.S.2d at 320 (citations omitted). The Court of Appeals explained that the New York State Legislature enacted Section 151 to " 'cover the field' in terms of the garnishee's right of setoff vis-a-vis the various enforcement devices." *Id.*, 421 N.E.2d at 812, 439 N.Y.S.2d at 320 (citing 1951 Report of the N.Y.Law Rev.Comm., p. 365).

New York's highest court has construed Section 151 broadly to preserve a bank's right of set off (granted by a contract) against an earlier filed state tax lien, as well as to protect a bank's right of set off in a debtor's general accounts against an earlier filed notice of execution. While the New York courts have not explicitly ruled whether Section 151 would prevail where the Superintendent of Banks has taken possession of a bank's assets under New York law, the version of Banking Law § 615 in effect in 1991 allows such a set off, as long as the liability was incurred prior to the Superintendent's intervention:

> When the superintendent shall take possession of the property and business of any banking organization, he shall forthwith give notice of such fact to all corporations, unincorporated associations, partnerships and individuals known to him to hold any assets of such banking organization. *No corporation, unincorporated association, partnership or individual having notice or knowledge that the superintendent has taken possession of such banking organization, shall have a lien or charge for any payment, advance or clearance thereafter made against any of the assets of such banking organization for liability thereafter incurred.*

N.Y.Banking Law § 615 (McKinney 1990) (emphasis added).

BCCI incurred liability for the loan and for most, if not all, of the currency transactions prior to the Superintendent's intervention.[12] Since the liabilities were incurred prior to the freeze, Section 615 does not prohibit a set off as a matter of state law.[13] Consequently,

---

**12.** One of the currency transactions may not have been completed prior to the Superintendent's intervention on July 5, 1991. *See* L-Claim, at ¶ 24(g). However, this factual ambiguity is no bar to resolving the instant motion to dismiss, because in the context of a motion to dismiss, the petitioner is entitled to the benefit of all reasonable inferences. This benefit, of course, will not be available on summary judgment or at a hearing on the merits.

**13.** In response to the collapse of BCCI, New York later amended Section 615. *See* § 11, An Act to Amend the Banking Law, 1993 N.Y.Laws ch. 496 (McKinney), *reprinted in* WL NY LEGIS 496, at 8 (1993); Memorandum of Department of Banking, *reprinted in* 1993 Session Laws of New York 2633, 2635–36, 2649–50 (McKinney). While the amended section expressly protects a bank's right of set off against the debts of a foreign bank whose assets have been seized by the Superintendent of Banks, it is unclear whether the amendment was intended to change the law or merely clarify it. *Id.* at 2650 ("the amendment *recognizes* that the holders of assets of the banking organization may be entitled to a right of setoff under applicable New York law") (emphasis added). Because the previous text of § 615 might be construed as equivocal (by failing either to prohibit or to provide for such a set off) and because the legislative history of the amendment does not affirmatively reflect an intention to change the law, the amendment is properly construed as a clarification of the law rather than a change. *See Porter v. Commissioner of the Internal Revenue,* 856 F.2d 1205, 1209 (8th Cir. 1988); *Barnes v. Cohen,* 749 F.2d 1009, 1015 (3d Cir.1984); *Brown v. Marquette Sav. & Loan Ass'n,* 686 F.2d 608, 615 (7th Cir.1982); 2B Sutherland Stat. Construction § 49.11, at 83–84 (5th ed. 1992) (citing cases).

In the amended provision, the original paragraph was retained (numbered as paragraph 1) and a new paragraph was added, which reads, in relevant part:

2. ... *Nothing in this section shall affect any right of set off permitted under applicable law;* provided, however, that in connection with the liquidation of a branch or agency of a foreign banking corporation pursuant to this article, no entity or individual may set off the business and property in this state of such foreign banking corporation ... other than those that arise out of transactions had by such entities or individual with such branch or agency ... and provided that such set off is otherwise permissible under applicable law.

American Express Bank's set offs were valid even though they were not asserted until after the Superintendent of Banks took possession of BCCI's assets.

Accordingly, the set offs created specific property interests in the underlying credit sufficient to establish standing under 18 U.S.C. § 1963(*l*). A hearing will be held on the validity and sufficiency of the petitioner's asserted interests in accordance with 18 U.S.C. § 1963(*l*)(5). *See United States v. BCCI Holdings (Luxembourg), S.A.,* 833 F.Supp. 32, 40 (D.D.C.1993), *aff'd,* 46 F.3d 1185 (D.C.Cir.), *cert. denied sub nom. Chawla v. United States,* —— U.S. ——, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995).

## CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that the government's Motion to Dismiss is denied; and it is

**FURTHER ORDERED** that the parties shall confer and file on or before October 18, 1996 a joint memorandum addressing the need for discovery, if any, the names of witnesses, if any, and a summary of the evidence, if any, that the parties anticipate they will introduce at a hearing on the merits. The parties shall also estimate the time that will be necessary to present their cases at the hearing. Upon consideration of the memorandum, the Court will issue an appropriate order and set a hearing date. IT IS SO ORDERED.

Chap. 496, § 11 (July 26, 1993), codified at N.Y. Banking Law § 615 (McKinney 1971 & 1996

Cumulative Supp.) (emphasis added).