46 F.3d 1185
 310 U.S.App.D.C. 268
 UNITED STATES of America, Plaintiff-Appellee,
v.
BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and
Commerce International, S.A., Bank of Credit and Commerce
International (Overseas) Limited, and International Credit
and Investment Company (Overseas) Limited, Defendants-Appellees.
Shrichand Chawla, Leo D. Curran, Willy Hermans, and Red
Circle Investment, Ltd., Jaleh Khorassanchy, Amit
Pandya, Soha, Inc., Idriss Devco, Inc.,
and S & L Gentrade, Inc.,
Claimants-Appellants.
UNITED STATES of America, Plaintiff-Appellee,
v.
BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and
Commerce International, S.A., Bank of Credit and Commerce
International (Overseas) Limited, and International Credit
and Investment Company (Overseas) Limited, Defendants-Appellees.
Raymond Davies, as Conservator for the Branch in Sierra
Leone of Bank of Credit and Commerce International
(Overseas) Limited, Claimant-Appellant.
 Nos. 93-5296, 93-5299.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 23, 1994.
Decided Feb. 14, 1995.
 
 Appeal from the United States District Court for the District of Columbia (91cv0655).
 William S. Dato argued the cause for appellants Shrichand Chawla, et al. With him on the briefs were Leonard B. Simon and Kevin P. Roddy.
 Maurice R. Garber argued the cause, for appellant Raymond Davies.
 Stefan D. Cassella, Atty., Dept. of Justice, argued the cause, for appellee U.S. of America. With him on the brief was Eric H. Holder, Jr., U.S. Atty., Dept. of Justice. Robert D. Sharp, entered an appearance.
 Michael Nussbaum and Eric L. Lewis filed a brief, for appellees BCCI.
 Before: SILBERMAN, HENDERSON, and RANDOLPH, Circuit Judges.
 Opinion for the Court filed by Circuit Judge SILBERMAN.
 SILBERMAN, Circuit Judge:
 
 
 1
 Appellants petitioned the district court to amend various court orders forfeiting assets of the Bank of Credit and Commerce International (BCCI) pursuant to the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. Secs. 1961-1968 (1988 & Supp. V 1993). The petitions were dismissed. We affirm on the grounds that appellants' claims of entitlement to the funds in question are not cognizable under the forfeiture provisions of the RICO Act.
 
 I.
 
 2
 In July, 1991, bank regulators in several countries jointly seized and shut down the operations of the four principal financial institutions that collectively made up the enterprise known as BCCI.[1] These measures, prompted by evidence of insolvency and extensive dealings in criminal affairs, were followed by the appointment of fiduciaries for BCCI by courts in Luxembourg and the Cayman Islands, the jurisdictions in which the principal entities were incorporated. A worldwide effort was then begun to consolidate all BCCI assets wherever located for a general global distribution to creditors and depositors.
 
 
 3
 BCCI's collapse prompted a flurry of civil and criminal investigations by various state and federal agencies in the United States, and criminal charges were brought against BCCI in several jurisdictions. Negotiations between law-enforcement officials and the court-appointed BCCI fiduciaries ultimately led to a comprehensive plea agreement filed with the federal district court in the District of Columbia. The agreement required BCCI to plead guilty to several state and federal criminal and civil charges, including RICO violations, and to forfeit to the Justice Department all BCCI assets located in the United States. It also provided, pursuant to the RICO statute, that half of all sums recovered by the government would be surrendered to the global liquidation fund; the other half was to be reserved for the Attorney General's discretionary allocation among several enumerated purposes, which included offsetting losses to "the Bank Insurance Fund of the FDIC and United States taxpayers" resulting from BCCI's collapse and making further contributions to the global liquidation fund. The plea agreement, with its forfeiture provision, was approved by supervising courts in Luxembourg and the Cayman Islands.
 
 
 4
 The agreement was opposed, however, by various third parties with claims against BCCI, who saw that a total forfeiture of BCCI's U.S. assets would undermine their independent efforts at recovery. Dissatisfied with the prospect of a heavily discounted distribution from the global liquidation fund, these parties sought to block the plea agreement. In bankruptcy proceedings in New York, putative tort creditors unsuccessfully tried to have the district court in D.C. enjoined from accepting the agreement. See In re Smouha, 136 B.R. 921, 928 (S.D.N.Y.), appeal dismissed, 979 F.2d 845 (2d Cir.1992). Still other parties contested the agreement directly before the district court. These claims too were rejected, however, and the district court formally accepted the plea agreement in January, 1992.
 
 
 5
 Shortly thereafter, the district court issued the first of three orders forfeiting all identified BCCI property located within the United States. The two later orders were issued in response to the discovery of additional assets. The forfeited amount--in aggregate approximately $552 million--largely came from bank accounts maintained at various U.S. banks in the names of specific overseas branches of BCCI. Following the district court's issuance of the three orders, numerous third parties, appellants among them, filed petitions claiming legal interests in the BCCI assets forfeited to the government.
 
 
 6
 Under the RICO Act, third parties are given an opportunity to challenge a forfeiture order if they can assert that they have a "legal interest in property which has been ordered forfeited." 18 U.S.C. Sec. 1963(l )(2). A party who files a petition alleging a "legal interest" that, if established, would compel amendment of the forfeiture is then entitled to a hearing. Id. Section 1963(l )(6) sets forth the grounds upon which the court may grant relief.
 
 
 7
 If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that--
 
 
 8
 (A) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or
 
 
 9
 (B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
 
 
 10
 the court shall amend the order of forfeiture in accordance with its determination.
 
 
 11
 18 U.S.C. Sec. 1963(l )(6).
 
 
 12
 Two of the petitions at issue in this appeal were filed by persons claiming to represent a class of worldwide depositors in BCCI. These "class petitioners" had previously initiated a massive civil RICO action against the founders, officers, and directors of BCCI as well as against numerous allegedly blameworthy "related" third parties. See Hamid v. Price Waterhouse & Co., 15 RICO Law Rep. 1234, 1242-43, 1251 (C.D.Cal.1992) (dismissing complaint on standing grounds). The class representatives' petitions merely asserted that the class members had an interest in the forfeited property. The nature and extent of that interest, they stated, could be found in an appended copy of the RICO complaint, 482 pages in length, filed in the Hamid case.
 
 
 13
 Raymond Davies, the other petitioner in this case, was appointed by a Sierra Leone court as conservator over BCCI's affairs in that country. As representative of the Sierra Leone branch depositors, Davies filed a petition challenging the forfeiture of $2 million held in the name of BCCI (Overseas) Sierra Leone at a New York bank. Davies alleged that the Sierra Leone depositors were entitled to a constructive trust over the funds because the alternative--pooling the Sierra Leone branch funds with those of the bank as a whole--would unjustly enrich BCCI; once recognized, such a trust would constitute a "superior" interest under Sec. 1963(l )(6)(A). Alternatively, he argued that the depositors qualified as "bona fide purchasers" entitled to amendment of the order under Sec. 1963(l )(6)(B).
 
 
 14
 The government moved to dismiss both parties' petitions on the ground that they had failed to state claims entitling them to relief under the statute. The class petitioners urged the district court to view their petitions as presenting the same legal theories Davies had advanced on behalf of the Sierra Leone depositors. The district court somewhat skeptically granted this request and, further, assumed that a constructive trust could qualify as a "legal interest" under the RICO Act. United States v. BCCI Holdings (Luxembourg), S.A., 833 F.Supp. 9, 13-14 (D.D.C.1993). It nevertheless dismissed the class petitioners' claims. Their allegations, the court held, did not entitle them to the equitable remedy of a constructive trust; that relief would be fundamentally inequitable to the other depositors worldwide, who would not have the benefit of contributions from the forfeited assets to the global liquidation fund. Id. The court also dismissed the class petitioners' alternative claim, based on their asserted status as general creditors, for failure to satisfy Sec. 1963(l )(2)'s requirement that third parties claim an interest "in property" subject to forfeiture. Id. at 14-16. The Davies petition was dismissed on similar grounds in a separate ruling. United States v. BCCI Holdings (Luxembourg), S.A., 833 F.Supp. 32, 39-40 (D.D.C.1993). The appeals were consolidated.
 
 II.
 
 15
 Appellants argue that the district court improperly ruled on the merits of their constructive trust allegations under Sec. 1963(l )(6)(A) without granting them the benefit of an evidentiary hearing. They also assert that the district court incorrectly held that their alternative claims as general creditors could not satisfy the "bona fide purchaser" requirement of Sec. 1963(l )(6)(B). The case turns, then, on whether the district court was correct in rejecting the petitions as a matter of law.
 
 
 16
 The government claims that the class petitioners are not even entitled to rely on the constructive trust theory on appeal because they did not properly raise it in their petitions below. The class petitioners made the constructive trust claim to the district court only at oral argument on the motions. For this reason, the district judge surely could have refused to permit the class petitioners--whose petitions were so sketchy and who did not even assert the constructive trust theory in their memorandum of law--to argue the issue at all. But she decided to "provide the claimants a generous benefit of the doubt and treat their petitions as if they alleged interests arising both from constructive trusts and from general debtor/creditor relationships." 833 F.Supp. at 13-14. Since Davies had properly presented the issue in his petition, it is not surprising that the district judge permitted the class petitioners, albeit grudgingly, to piggy-back on his theory, especially as the court ultimately rejected the claim. In any event, the government only asserts that the class petitions cannot support a constructive trust claim, not that the district court was in error in giving the class petitioners such wide latitude; since the government does not actually challenge the district judge's ruling, we do not understand why the government even raises the matter before us.
 
 
 17
 As to the district court's disposition of the constructive trust claim, the government asks that we affirm--but on different grounds. It argues that since a constructive trust is a creation of equity courts, see, e.g., Healy v. Commissioner, 345 U.S. 278, 282, 73 S.Ct. 671, 674, 97 L.Ed. 1007 (1953) ("A constructive trust is a fiction imposed as an equitable device for achieving justice." (emphasis added) (citation omitted)), it cannot be recognized under Sec. 1963(l )(6)(A) as a "legal right, title, or interest" (emphasis added). A party with any sort of equitable, as opposed to legal, claim--using the classic common law distinction--may only seek relief by appealing to the Attorney General, who may
 
 
 18
 grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this chapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this chapter....
 
 
 19
 18 U.S.C. Sec. 1963(g)(1). As recognized by the Second Circuit in United States v. Schwimmer, 968 F.2d 1570 (2d Cir.1992), whether the statute recognizes equitable interests or only strictly "legal" ones is a close question. See id. at 1582 (a "legal interest" is an interest "in property or in claim cognizable at law in contrast to equitable interest") (quoting Black's Law Dictionary, 894 (6th ed. 1990)). The legislative history of the 1984 amendments that created the Sec. 1963(l ) proceedings suggests that Congress contemplated a distinction between traditionally "legal" and traditionally "equitable" interests. The Senate report indicated that Sec. 1963(l ) hearings were for parties claiming "a legal basis for relief" whereas the Attorney General's authority to grant relief under Sec. 1963(g)(1) was the "appropriate ex[cl]usive remedy" for those asserting "merely equitable grounds." S.Rep. No. 225, 98th Cong., 2d Sess. 208, reprinted in 1984 U.S.CONG.CODE & ADMIN.NEWS 3182, 3391. The government, then, has some support in urging us to limit the scope of "interest" under Sec. 1963(l )(6)(A) to exclude equitable claims. But the congressional history is not dispositive. It is unclear whether the drafters intended to use the words "legal" and "equitable" in their technical senses or whether they were using the terms more as laymen do (and sometimes lawyers as well) with "legal" meaning "legally enforceable" or "recognized under law" and "equitable" implying "fair and just." Compare Black's Law Dictionary, 892 ("legal" defined as "according to law" or "proper or sufficient to be recognized by the law"); id. at 537 ("equitable" defined as "conformable to the principles of justice and right"). The Senate report apparently used the term "equitable" in its more expansive sense when referring to the Attorney General's authority to refashion forfeitures to protect innocent third parties, for Sec. 1963(g)(1) allows the Attorney General to take any action "in the interest of justice." It would follow that the word "legal" was used in the legislative history--and, presumably, the statute--in its broader sense as well.
 
 
 20
 At the end of the day, we agree with our sister circuits that have rejected the notion that Congress intended to draw the ancient, but largely ignored, distinction between technically legal and technically equitable claims in forfeiture challenges. See Schwimmer, 968 F.2d at 1582; United States v. Lavin, 942 F.2d 177, 185 n. 10 (3d Cir.1991); United States v. Campos, 859 F.2d 1233, 1238-39 (6th Cir.1988) (dicta). Prior to 1984, third parties claiming an interest in forfeited property could only petition the Attorney General for relief. Section 1963(l ) was added to alleviate due process concerns; obviously, only the property of the defendant (including property held by a third party pursuant to a voidable transaction) can be confiscated in a RICO proceeding. See S.Rep. No. 225, 98th Cong., 2d Sess. 208, reprinted in 1984 U.S.CONG.CODE & ADMIN.NEWS 3182, 3391. It seems to us that it would just as much offend notions of due process for the government to scoop up property in which a third party has certain kinds of equitable interests as it would for the government to take property in which a third party has a "legal" interest. Suppose, for instance, that a lawyer was a trustee who held assets in trust for the benefit of others, and that the lawyer, who was also part of a racketeering ring, used those assets in furtherance of criminal ends. We simply cannot imagine that Congress would have intended that the trust corpus be forfeited to the government without opportunity for challenge by the beneficiaries any more than it would property that the lawyer held as a bailee. Indeed, it seems to us that focusing on the distinction between equitable and legal interests obscures Congress' real intent. The key words in section 1963(l )(6)(A) to identify statutorily cognizable third party interests are "vested," "superior," and "at the time." To prevail under that provision, a third party must establish that his interest had vested or was superior to the defendant's interest "at the time of the commission of the acts which gave rise to the forfeiture."
 
 
 21
 It is because of that language in the section that we agree with the government that a constructive trust may not be used to defeat the government's forfeiture claim. Congress intended that as far as Sec. 1963(l )(6)(A) is concerned, a third party's claim is to be measured not as it might appear at the time of litigation, but rather as it existed at the time the illegal acts were committed. A constructive trust is a remedy that a court devises after litigation. It is, as we have noted, a fictional trust--not a real one. It could not have been shown to exist at the time the acts were committed. Moreover, Congress provided under Sec. 1963(c) of the RICO forfeiture Act that title in all criminally acquired property of the defendant is deemed to "vest[ ] in the United States upon the commission of the act giving rise to forfeiture." Congress, in other words, devised a statutory remedial scheme that reaches back to the time of the criminal acts to forfeit the property to the United States. The statute thus creates a retroactive legal fiction similar to a constructive trust for the benefit of the United States. It is not open to a court to fashion another remedy (a competing fiction) that also reaches back to snatch the property away from the United States--which is exactly what a constructive trust would do.
 
 
 22
 We therefore disagree with those courts that have determined that a constructive trust can be interposed as superior to the government's forfeiture claim. See Schwimmer, 968 F.2d at 1582; Lavin, 942 F.2d at 187; Campos, 859 F.2d at 1238-39 (dicta); United States v. Marx, 844 F.2d 1303, 1307-08 (7th Cir.1988). While those courts, in our view, properly rejected the government's legal/equitable distinction, they did not consider whether a judicially imposed constructive trust would be inconsistent with the statutory remedial scheme.
 
 III.
 
 23
 Alternatively, appellants argue--in another effort to gain a direct claim against the forfeited property--that even if, as mere depositors, they are only general creditors, they should be thought of as "bona fide purchasers" entitled to recover under Sec. 1963(l )(6)(B). That section, it will be recalled, provides that a petitioner can establish a statutory "interest" by demonstrating that he
 
 
 24
 is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;
 
 
 25
 18 U.S.C. Sec. 1963(l )(6)(B). Appellants' claim appears rather anomalous on its face, since bank depositors, as general creditors, have no interest in the specific accounts to which their deposits might be traced, only in the defendant's estate as a whole--and therefore can have no interest in particular assets forfeited, as required under both prongs of Sec. 1963(l )(6), unless they have already secured a judgment against the debtor and perfected a lien against a particular item. See Schwimmer, 968 F.2d at 1581; Campos, 859 F.2d at 1240. Nevertheless, petitioners argue that since the amount of their claims (in the billions of dollars, we are told) exceeds BCCI's entire estate, their interest necessarily extends to any portion of the estate that has been forfeited to the government. They rely primarily on a Fourth Circuit opinion, United States v. Reckmeyer, 836 F.2d 200 (4th Cir.1987), applying an identical statutory section that applies to drug trafficking crimes, 21 U.S.C. Sec. 853(n) (1988). Reckmeyer accepted the theory that general creditors have an interest in forfeited property if that property represents their only means of recovery and, further, that under such circumstances they should be regarded as "bona fide purchasers." Reckmeyer, 836 F.2d at 205, 207-08.
 
 
 26
 The government argues that both parts of Reckmeyer 's holding are incorrect and should not be followed. The Second Circuit, in Schwimmer, distinguished Reckmeyer on grounds that whereas the petitioners before it had asserted only an interest arising under 1963(l )(6)(A), which requires that a claimant have a "vested" interest in forfeited property or one "superior" to the defendant-debtor, Reckmeyer dealt with a "bona fide purchaser" claim under the provision of the drug crime for forfeiture statute parallel to Sec. 1963(l )(6)(B) of the RICO Act. See 968 F.2d at 1581 & n. 8. It is this latter provision upon which petitioners now rely.
 
 
 27
 We respectfully disagree with Reckmeyer. We think the government is correct that a general creditor can never have an interest in specific forfeited property, no matter what the relative size of his claim vis-a-vis the value of the defendant's post-forfeiture estate. Were it otherwise, the court litigating the forfeiture issue would be converted into a bankruptcy court and would not be able to grant forfeiture to the government until it determined that no general creditor would be unable to satisfy its claim against the defendant. That result appears patently at odds with the statutory scheme, which directs parties without an interest in specific property to seek relief from the Attorney General, not the court adjudging the forfeiture. The Attorney General has authority to dispense confiscated funds "to protect the rights of innocent persons," 18 U.S.C. Sec. 1963(g)(1), and general creditors seem precisely the type of innocent persons Congress had in mind.
 
 
 28
 Although a general creditor whose claim exceeds the value of the debtor's estate may in some sense have a legal interest against the entire estate, that is simply not the same as an interest in specific forfeited property--and contrary to Reckmeyer, under either prong of Sec. 1963(l )(6), only the latter can defeat the government's claim. In addition to disregarding the statute's "in the property" requirement, Reckmeyer also relied upon an even more troublesome interpretation of the statute at the second stage of its analysis. The Fourth Circuit construed the term "bona fide purchasers for value" "liberally," as it put it, to include a general creditor. It reached this conclusion by reasoning that Congress could not have intended that "a car dealer who sold a car to a later convicted defendant without knowledge of the potential forfeitability of the defendant's assets could have the payment he received for the car forfeited while a person who purchased otherwise forfeitable stock from the defendant would be protected." Reckmeyer, 836 F.2d at 208. But we do not understand why the dealer's situation would be analogous to a general creditor's since, by hypothesis, he had already been paid. Nor do we see how, in the first case, the cash received by the dealer would be forfeited as the defendant's property (unless, perhaps, it had not been acquired in an arms-length transaction). Finally, the conclusion which the Fourth Circuit reached by its reasoning--that Congress wished to protect all those who engage in arms-length transactions with the defendant--would mean that all innocent creditors would fall into the bona fide purchaser category. The difficulty with this position is that it is contrary to the natural meaning of what Congress said. Bona fide purchasers are not the same thing as general creditors.
 
 
 29
 * * *
 
 
 30
 In sum, we affirm the district court's dismissals of appellants' petitions on the grounds that they failed to state claims under the statute.
 
 
 31
 So ordered.
 
 
 
 [1]
 These four organizations were BCCI Holdings (Luxembourg), S.A., Bank of Credit and Commerce International (Luxembourg), S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited. At the time of the shutdown, these BCCI companies had operations in 69 countries worldwide