UNITED STATES of America,

v.

BCCI HOLDINGS (LUXEMBOURG), S.A., Bank of Credit and Commerce International, S.A., Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, Defendants.

Crim. Action No. 91–0655 (JHG).

United States District Court, District of Columbia.

Aug. 26, 1997.

Stefan D. Cassella, Rena M. Johnson, Michele L. Crawford, U.S. Dept. of Justice, Washington, DC, for the Government.

Mary C. Mone, Hollyer, Brady, Smith, Troxell, Barrett, Rockett, Hines & Mone, New York City, for Claimants.

### *In re* Third Round Petition of China Guangzhou International Economic & Technical Cooperation Company

### MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

Presently pending is the United States' Motion to Dismiss ("Motion to Dismiss") the Verified Petition of China Guangzhou International Economic & Technical Cooperation Company ("CGIET"), which was filed pursuant to 18 U.S.C. § 1963(*l* ) ("L–Claim"). The government has moved to dismiss the L-claim due to lack of standing and for failure to state a claim. For the reasons expressed below, the Motion to Dismiss will be denied.

### BACKGROUND

The facts surrounding the collapse of BCCI are well known in the financial and legal communities, but certain facts bear repeating to set the stage for resolving the instant motion to dismiss CGIET's L–Claim.[1] In early 1991, the Bank of England received troubling information about BCCI's financial condition and integrity. In response, it commissioned a special audit, which "disclosed evidence of a complex and massive fraud at BCCI, including substantial loan and trea-

---

1. "BCCI," as used herein, refers collectively to BCCI Holdings (Luxembourg) S.A., its two operating subsidiaries, Bank of Credit and Commerce International, S.A., and Bank of Credit and Commerce International (Overseas) Limited, and International Credit and Investment Company (Overseas) Limited, an entity previously found to be the alter ego of the other BCCI entities.

sury account losses, misappropriation of funds, unrecorded deposits, the creation and manipulation of fictitious accounts to conceal bank losses, and concealment from regulatory authorities of BCCI's mismanagement and true financial position." Corrigan, Mattingly & Taylor, *The Federal Reserve's Views on BCCI*, 26 Int'l Law. 963, 970–71 (1992) (based on testimony before the Committee on Banking, Finance and Urban Affairs of the United States House of Representatives on September 3, 1991).

The results of the audit were shared with regulators in other countries, and, on July 5, 1991, banking regulators in the United Kingdom, Luxembourg and the United States, froze assets owned or controlled by BCCI. In New York, the Superintendent of Banks seized BCCI's assets at various New York banks, including those at First American Bank of New York ("FABNY"). By July 6th, eighteen countries had shut down BCCI's operations in their jurisdictions, and, as of July 29, 1991, forty-four countries had closed down BCCI branches.

On November 15, 1991, a three-count Indictment, which included charges of conspiracy, wire fraud and racketeering against BCCI, was filed in this Court. On January 24, 1992, this Court, following findings of fact and conclusions of law with supporting reasons made in open court, accepted the pleas of guilty of the four corporate defendants, collectively known as BCCI, and the Plea Agreement between them and the United States of America. *See* Transcript of Guilty Plea Proceedings at 7 (Jan. 24, 1992). In accordance with 18 U.S.C. § 1963, this Court then entered an Order of Forfeiture.

Under paragraph 9 of the Plea Agreement and pursuant to the Order of Forfeiture, BCCI forfeited all of its property interests in the United States. Pursuant to paragraph 1(e) of the Forfeiture Order, the corporate defendants forfeited to the United States their ownership interests in all property located in the United States, including, without limitation, real property and all tangible and intangible personal property, however held, whether subsequently identified, determined or discovered in the course of the ongoing liquidation proceedings described therein or otherwise identified, determined, or discovered in any manner at any time (excluding property brought into the United States by or on behalf of Court–Appointed Fiduciaries of BCCI in the course of the management or disbursement of the liquidation estates).

Attached to the First Order of Forfeiture was a listing of BCCI accounts, with corresponding numbers, names, and approximate balances, which the United States Marshals Service was directed to seize forthwith. Because the government was unable to verify certain information concerning additional forfeitable accounts at the time the Order of Forfeiture was entered, the Court issued a First Supplemental Order on January 31, 1992, which directed immediate seizure of the specific assets listed therein. The Court later amended the Order of Forfeiture to include additional assets, including property set forth in Second and Third Supplemental Lists of Forfeited Property. *See* Order of Forfeiture of July 29, 1992 (Second Order of Forfeiture); Order of Forfeiture of August 19, 1993 (Third Order of Forfeiture). Attached to the Third Order of Forfeiture, which is relevant to the L–Claim presently before the Court, was the Third Supplemental List of Forfeited Property aggregating $101,302,465.54.

The Plea Agreement also established the Worldwide Victims Fund and the U.S. Fund. Under the terms of the Plea Agreement, forfeited assets were to be disbursed in equal amounts to the Worldwide Victims Fund and the U.S. Fund. *See* Plea Agreement ¶ 11(c). The broad purpose of the Worldwide Victims Fund, operated by the Court–Appointed Fiduciaries, is to distribute funds "only to innocent depositors, creditors and other victims of BCCI whose claims are not derived directly or indirectly through violations of United States or other laws concerning narcotics, terrorism, money laundering, crimes of violence, or other acts generally recognized as felonies or similar crimes under the law of countries subscribing to recognized norms of international justice." *Id.* ¶ 14.

The purpose of the U.S. Fund is more specific, but no less compensatory. In addition to allowing for reimbursement of the costs of investigation and prosecution of

BCCI, bank insurance and other matters, the U.S. Fund is also available to provide "restitution to victims of BCCI, which may include remission to the Court Appointed Fiduciaries in accordance with 18 U.S.C. § 1963(g) for the purpose of facilitating an increase in assets available for distribution by the Court–Appointed Fiduciaries to innocent worldwide victims of BCCI, and which may include claims related to the failure of Cen-Trust, if any." *Id.* ¶ 12(f). As a result of BCCI's guilty plea and the subsequent criminal forfeiture proceedings, by July 1996, the United States had "recovered nearly $800 million, virtually all of which has been, or will be, distributed to the victims of the fraud." Testimony of Stefan Cassella before the Judiciary Committee of the House of Representatives (July 22, 1996), 1996 WL 410099, *5 (F.D.C.H.).[2]

In compliance with 18 U.S.C. § 1963(*l*)(1) and to inform third parties of their potential rights to seek recovery of assets declared forfeited in the Third Order of Forfeiture, the United States published notice of the Order of Forfeiture, as amended, during the period September 3, 1993, and September 27, 1993 in eleven major newspapers including the *Wall Street Journal,* the *New York Times,* the *Chicago Tribune,* the *Los Angeles Daily Journal,* the *Washington Post,* and the *International Herald Tribune. See* United States' Notice to the Court (filed Sept. 21, 1993). In addition, personal notice was sent to over 523 persons and entities. *Id.* at Ex. 2, at 11. In response, CGIET timely filed the instant L–Claim.

CGIET claims an interest in a credit in the amount of "$420,828 that was in the process of being transmitted on July 5, 1991, but had not been completed at the time that regulatory authorities took action against defendants throughout the world." CGIET L–Claim ¶ 4. According to CGIET, it has legal right, title, or interest in such amount credited to account number 11801008 at First American

Bank in New York ("FABNY") in the name of BCC Ghana Ltd. ("BCC Ghana"). *Id.* ¶ 3; Third Supplemental List of Property at 3, attached to Third Order of Forfeiture.

For the purposes of this motion, the Court assumes the following facts to be true. CGIET is a corporation wholly owned by the People's Republic of China ("PRC"). CGIET ¶ 1. In 1991, it was engaged in an economic aid project sponsored by the PRC and referred to as the National Theatre of Ghana. *Id.* ¶ 5. CGIET supervised construction in connection with the project and, accordingly, on or before July 5, 1991, it initiated a wire transfer to pay for material, equipment and employee wages in Ghana through a local BCCI branch, BCC Ghana. *Id.* ¶¶ 5–6.

The funds transfer at issue was originated by CGIET when it directed the transfer of US$420,828.00 from its bank in China, the Bank of China ("BOC"), Yuexiu Sub-branch of Zhujiang Branch. *Id.* ¶ 6. BOC then executed a payment order to its New York branch. *Id.* ¶ 7. BOC's New York branch, in turn, executed a payment order to FABNY calling for such a credit to BCC Ghana in favor of beneficiary CGIET. *Id.* ¶ 8. While the funds were received by FABNY on July 5, 1991, *id* ¶ 9, and (at some point) credited to BCC Ghana's account number 11801008, *see* Third Supplemental List of Forfeited Property at 2, such funds were never credited by BCC Ghana to CGIET's account held at BCC Ghana. *Id.* ¶ 13. CGIET alleges that, "on or after July 5, 1991, FABNY placed the same funds in a freeze account, purportedly under the direction of the Federal Reserve Bank." *Id.* ¶ 11. On July 8, 1991, CGIET attempted to cancel the wire transfer and requested a refund from FABNY, *id.* ¶ 10, but was advised on July 9, 1991, that all assets of BCCI, including those of BCC Ghana at FABNY, were frozen by banking regulatory authorities.[3] Pursuant to

---

**2.** In 1995, over $225 million was disbursed to the Court Appointed Fiduciaries for the Worldwide Victims Fund. *See* Notice to the Court at 1 (filed Aug. 13, 1996). On August 1, 1996, the United States disbursed an additional $83,651,-863.24, *id.* at 2, and, on May 22, 1997, Attorney General Janet Reno "determined that the United

States would transfer 100 percent of its share of the forfeited funds to the Worldwide Victims Fund so that the funds might be distributed to all BCCI victims equally on a pro rata basis." Notice to the Court at 2 (filed July 11, 1997).

**3.** The petitioner has filed a motion for leave to file a surreply affidavit, which, will be granted

this Court's Order of August 19, 1993, FAB-NY ultimately transferred the funds to the Court Registry Investment System ("CRIS") account.

The United States has moved to dismiss CGIET's L–Claim, contending that CGIET lacks standing as an unsecured creditor on the ground that it became a general creditor of BCC Ghana once BCCI acquired title to the funds by FABNY's acceptance of BOC's payment order. *See* Motion to Dismiss at 11–12. CGIET filed a brief in opposition, and both parties later appeared at a hearing before this Court on the government's motion.

## DISCUSSION

BCCI's assets were forfeited pursuant to 18 U.S.C. § 1963,[4] which sets forth an orderly procedure by which third parties seeking to recover interests in forfeited property may obtain judicial resolution of their claims. It permits any person, other than the defendant, claiming a legal interest in forfeited property to petition the Court for a hearing to adjudicate the validity of that interest. 18 U.S.C. § 1963(*l* )(2).[5] Section 1963(*l* )(6) sets forth the substantive elements that a third party must establish to obtain amendment of an order of forfeiture:

> If, after the hearing, the court determines that the petitioner has established by a preponderance of the evidence that—

(a) the petitioner has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property under this section; or

(B) the petitioner is a bona fide purchaser for value of the right, title, or interest in the property and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture under this section;

the court shall amend the order of forfeiture in accordance with its determination. 18 U.S.C. § 1963(*l* )(6).

 A petitioner must first establish standing. Only by establishing standing and alleging the requisite elements of either § 1963(*l* )(6)(A) or § 1963(*l* )(6)(B) may a party obtain judicial relief from an order of forfeiture. *See United States v. BCCI Holdings (Luxembourg), SA., et al. (In re Petition of American Express Bank)*, 941 F.Supp. 180, 184 (D.D.C.1996); *United States v. BCCI Holdings (Luxembourg), SA., et al. (In re Petition of BCCI(O) Foreign Branches)*, 833 F.Supp. 32, 36 (D.D.C.1993), *aff'd*, 46 F.3d 1185, 1188 (D.C.Cir.), *cert. de-*

and construed to amend the L–Claim by including an alleged fact that BCC Ghana's account with FABNY was closed prior to July 5, 1991. *See* Surreply Aff. ¶ 2.b and Ex. B (BCC Ghana letter of March 31, 1994).

4. 18 U.S.C. § 1963(a) provides, in relevant part: Whoever violates any provision of section 1962 of this chapter shall ... forfeit to the United States, irrespective of any provision of State law—

> any interest the person has acquired or maintained in violation of section 1962,
> (2) any—
> (A) interest in,
> (B) security of,
> (C) claim against, or
> (D) property or contractual right of any kind affording a source of influence over,

any enterprise which the person has established, operated, controlled, conducted, or participated in the conduct of, in violation of section 1962; and

(3) any property constituting, or derived from, any proceeds which the person has obtained directly or indirectly, from racketeering activity or unlawful debt collection in violation of section 1962.

The court, in imposing sentence on such person shall order ... that the person forfeit to the United States all property described in this subsection.

5. This provision provides:

Any person other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section may, within thirty days of the final publication of notice or his receipt of notice under paragraph (1), whichever is earlier, petition the court for a hearing to adjudicate the validity of his alleged interest in the property. The hearing shall be held before the court alone, without a jury.

nied sub nom. Chawla v. United States, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); United States v. BCCI Holdings (Luxembourg), S.A., et al. (In re Petition of Chawla), 833 F.Supp. 9, 13 (D.D.C.1993), aff'd, 46 F.3d 1185, 1188 (D.C.Cir.), cert. denied sub nom. Chawla v. United States, 515 U.S. 1160, 115 S.Ct. 2613, 132 L.Ed.2d 856 (1995); see also United States v. Schwimmer, 968 F.2d 1570, 1584 (2nd Cir.1992); United States v. Lavin, 942 F.2d 177, 187 (3rd Cir. 1991). If a third party fails to allege in its petition all elements necessary for recovery, including those relating to standing, the court may dismiss the petition without providing a hearing. See In re Petition of American Express Bank, 941 F.Supp. at 184–85; see also S.Rep. No. 225, 98th Cong., 1st Sess. 191, 208 n. 46 (Sept. 12, 1983); United States v. Campos, 859 F.2d 1233, 1240 (6th Cir.1988); United States v. Mageean, 649 F.Supp. 820, 825 (D.Nev.1986), aff'd without opinion, 822 F.2d 62 (9th Cir.1987).

A motion to dismiss under Fed.R.Civ.P. 12(b)(6) may be granted if it appears that the petitioner can prove no facts that would entitle it to relief Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); Kenneda v. United States, 880 F.2d 1439, 1442 (D.C.Cir.1989). The Court assumes well-pleaded facts to be true and construes the petition liberally, granting a petitioner the benefit of any reasonable inferences that can be derived from the facts alleged. Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). The Court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations. Kowal v. MCI Communications, 16 F.3d 1271, 1275 (D.C.Cir.1994).

■ Section 1963(l)(2) requires a party to assert "a legal interest in property forfeited to the United States" to have standing. This requirement is imposed to further the purpose of an L–Claim proceeding, which, while ancillary to the underlying criminal case, is intended to ensure that property forfeited to the United States was that of the defendant; it does not attempt to divide the defendant's estate among competing claimants. See

United States v. BCCI Holdings (Luxembourg), S.A. (In re Petitions of General Creditors), 814 F.Supp. 106, 110 (D.D.C. 1993). This latter task is properly performed at a liquidation proceeding, where all parties without a "legal interest" in forfeited property can recover on a pro rata basis with the many other claimants to the debtor's estate. Id. at 111; see Downriver Community Fed. Credit Union v. Penn Square Bank, 879 F.2d 754 (10th Cir.1989), cert. denied, 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990); First Empire Bank–New York v. F.D.I.C., 572 F.2d 1361 (9th Cir.1978), cert. denied, 439 U.S. –919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).

■■ The critical inquiry in an L–Claim proceeding is, therefore, ownership of the disputed funds. As recognized by this Court and most, if not all, other courts addressing the issue, an unsecured creditor does not possess an interest in any specific asset of a debtor but merely has a general interest in the debtor's entire estate. See In re Petition of Chawla, 46 F.3d at 1191; United States v. BCCI Holdings (Luxembourg), S.A. (In re Petitions of General Creditors), 941 F.Supp. 189, 191 (D.D.C.1996); see also Schwimmer, 968 F.2d at 1581; Campos, 859 F.2d at 1240; United States v. Reckmeyer, 836 F.2d 200, 206 & n. 3 (4th Cir.1987); Mageean, 649 F.Supp. at 828. Because a general creditor is unable to assert an interest in a specific asset, it cannot assert a legal right, title, or interest "in property which has been ordered forfeited" as required by § 1963(l)(2), at least in situations where, like here, a defendant's entire estate is not subject to forfeiture. In re Petition of Chawla, 46 F.3d at 1191; see Reckmeyer, 836 F.2d at 206 n. 3 ("It is the dilemma of linking their interest to a specific asset rather than the problem of asserting a legal interest in the debtor's estate that frustrates general creditors who attempt to contest . . . forfeitures."). Accordingly, absent a showing of an interest in a specific asset, the petitioners would lack standing to assert a claim in these L-proceedings.

In its motion to dismiss, the United States argues that CGIET lacks standing as an unsecured creditor on the ground that it

became a general creditor of BCC Ghana once BCCI acquired title to the funds by FABNY's acceptance of the payment order. *See* Motion to Dismiss at 11–12. "When FABNY accepted the payment order from the Bank of China directing it to transfer funds into BCC Ghana's account, title to those funds vested in BCC Ghana. When BCC Ghana failed to credit CGIET's account, CGIET became a general unsecured creditor." *Id.* at 12.[6] Opposing the motion, CGIET argues that on July 8, 1991, it canceled the transfer before it was completed.[7] *See* CGIET's Opp. at 1. CGIET also argues that FABNY never issued, and BCC Ghana never accepted, a payment order transferring the credit to BCC Ghana's account, *id.* at 4, and that BCC Ghana could not have accepted a payment order because it closed its account prior to July 5, 1991. *See* Surreply Aff. ¶ 2.b and Ex. B.

Assuming petitioner's facts to be true, in this transaction CGIET acted as both the originator and the beneficiary. *See* N.Y.U.C.C. §§ 4–A–103(1)(b), 4–A–104(3) & Official Comment 2. BOC was, therefore, the originator's bank, *id.* § 4–A–104(4), and BCC Ghana, as the bank that would pay beneficiary CGIET, acted as the beneficiary's bank. *Id.* § 4–A–103(1)(C). FABNY, as the correspondent bank in New York for both BOC and 4–A–104(2). *See also id.* § 4–A–103(1)(d) (defining receiving bank). A sender is the entity giving an instruction to a receiving bank, *id.* § 4–A–103(1)(e), and the sender can "be [the] bank with correspon-

dent relations between both the originator's bank and beneficiary's bank [FABNY here], implementing a payment order received by it by instructing the beneficiary's bank to transfer funds to the beneficiary." Fry, *Basic Concepts in Article 4A: Scope and Definitions,* 45 Bus.Law. 1401, 1412 (1990); *see id.* at 1415–16 (describing funds transfer relationship among originator's bank, beneficiary's bank and a mutual correspondent bank similar to the instant relationship between BOC, BCC Ghana and FABNY).

Acceptance within the meaning of Article 4–A of the New York Uniform Commercial Code, which provides the rule of decision for this funds transfer, *see* N.Y.U.C.C. § 4–A–101 Official Comment, is the key to resolving the instant dispute, because title to funds in a wire transfer passes to a receiving bank upon acceptance of a payment order.[8] *See, e.g., In re Petitions of General Creditors,* 814 F.Supp. at 109; *Shawmut Worcester County Bank v. First American Bank & Trust,* 731 F.Supp. 57, 60 (D.Mass.1990). Pursuant to Article 4–A, a funds transfer is completed when the bank of the beneficiary of the funds transfer accepts a payment order. N.Y.U.C.C. § 4–A–104(1). Such acceptance occurs, subject to certain conditions, at the earliest of: (1) when the bank pays the beneficiary or notifies the beneficiary of receipt of the order or that the account has been credited; (2) when the bank receives payment of the entire amount of the transfer, or (3) the beginning of the bank's next funds-transfer business day. N.Y.U.C.C. § 4–A–209(2).

---

6. The United States characterizes FABNY as the beneficiary's bank of beneficiary BCC Ghana in a second transaction (a "cover" transaction) similar to that described in *United States v. BCCI Holdings (Luxembourg), S.A.* (*In re Petitions of Incomplete Wire Transfers*), 1994 WL 914456 *2 (D.D.C., Oct.28, 1994). While this may be accurate, on a motion to dismiss, the Court accepts as true the facts pled by the petitioner, and nowhere has the petitioner alleged a separate "cover" transaction.

7. This argument, of course, is a loser since a cancellation request after the intervention was meaningless. Similarly without merit is the contention that the Federal Reserve entered an order in February of 1991 that precluded FABNY from accepting wire transfers such as the one at issue here. Neither argument merits further discussion.

8. A payment order is defined in Art. 4–A–103–(1)(a) as

> an instruction of a sender to a receiving bank, transmitted orally, electronically, or in writing to pay, or to cause another bank to pay, a fixed or determinable amount of money to a beneficiary if:
> (i) the instruction does not state a condition to payment to the beneficiary other than time of payment,
> (ii) the receiving bank is to be reimbursed by debiting an account of, or otherwise receiving payment from the sender, and
> (iii) the instruction is transmitted by the sender directly to the receiving bank or to an agency, funds transfer system, or communication system for transmittal to the receiving bank.

Because an accepted transfer cannot be revoked without the consent of the beneficiary, *Middle East Banking Co. v. State Street Bank Int'l*, 821 F.2d 897, 901–02 (2d Cir. 1987), and the beneficiary's bank incurs an obligation to the beneficiary upon acceptance of the funds, *see* N.Y.U.C.C. § 4–A–404, the ownership interest in those funds must pass from the originator upon completion of the funds transfer. *See Shawmut Worcester County Bank*, 731 F.Supp. at 60.

■ Thus, under Article 4–A and as directly applicable to the facts alleged in this case, a beneficiary bank (like BCC Ghana) would accept a payment order upon receipt of payment of the entire amount of the sender's order pursuant to paragraph (a) or (b) of Article 4–A–403(1).[9] N.Y.U.C.C. § 4–A–209(2)(b); *see* Baxter & Bhala, *Proper and Improper Execution of Payment Orders*, 45 Bus.Law. 1447, 1452 (1990) ("acceptance occurs ... at the time the bank receives payment"); Nelson, *Settlement Obligations and—Bank Insolvency*, 45 Bus.Law. 1473, 1476 (1990) ("When payment is made on a funds transfer system, the payment is made when that settlement is complete.") (citing U.C.C. § 4A–403(b)). Pursuant to Section 4–A–403(1)(b), if the sender is bank (like FABNY here), payment occurs when the sender (FABNY) credits an account of the receiving bank (BCC Ghana) with the sender (FAB-

NY). *Id.* § 4–A–403(1)(b); *see* Ballen & Diana, *Duties of the Beneficiary's Bank*, 45 Bus.Law. 1467, 1468 (1990) ("payment by the sender [bank] to the beneficiary's bank occurs ... if the sender credited an account of the beneficiary's bank with the sender"). Consequently, of the Article 4–A acceptance possibilities most relevant here, BCC Ghana would have accepted the payment order and acquired title (making CGIET a general creditor of BCCI) upon FABNY's proper execution of the instructions in the payment order by crediting BCC Ghana's account. N.Y.U.C.C. §§ 4–A–209(2)(b); 4–A–403(1)(b).

■ Examined in this light, CGIET's L–Claim will survive the motion to dismiss, because it is not clear beyond doubt that the petitioner can prove no facts that would entitle it to relief. Allowing CGIET all reasonable inferences and assuming true the facts alleged, the petitioner is claiming that while FABNY received BOC's payment order, it failed, in turn, to credit BCC Ghana's account before the freeze was imposed by regulatory authorities.[10] If this were so, BCC Ghana, as the beneficiary bank, could not have accepted the payment because, under Article 4–A–210(3),[11] when BCCI's accounts were frozen by regulatory authorities, all unaccepted payment orders would have been rejected. Alternatively, CGIET is contending that, prior to July 5, 1991, BCC Ghana closed its ac-

---

9. There are, of course, other ways for a beneficiary bank to accept a payment order, but this appears to be method relevant to the instant L–Claim.

10. Construing its L–Claim liberally, the petitioner appears to be claiming that FABNY received the funds, sat on them, and then only after the intervention on July 5, 1991, placed the funds in a suspense account (purportedly at the direction of the Federal Reserve) rather than transferring timely the credit to BCC Ghana's account. While such actions by FABNY would be highly unusual and contrary to normal banking practice, the Court will allow the petitioner all reasonable inferences and accept as true this factual allegation and reasonable inference thereto.

11. This provision provides that "[i]f a receiving bank suspends all payments, all unaccepted payment orders issued to it are deemed rejected at the time the bank suspends payments." Although it is not entirely clear from the factual allegations, it appears that the payment order may have been issued but not accepted at the time of the regulatory intervention. If so, this

provision may be applicable also. *See* N.Y.U.C.C. § 4–A–210(3) Official Comment 4 (cross-referencing Section 4–104(1)(k), which provides: " 'Suspends payments' with respect to a bank means that it has been closed by order of the supervisory authorities, that a public officer has been appointed to take it over or that it ceases or refuses to make payments in the ordinary course of business."); 6B Hawkland, Uniform Commercial Code Series § 4A–210:01, at 193 (1993 & 1996 Supp.) ("If the receiving bank suspends payments, all unaccepted payment orders are deemed rejected at the time the bank suspends payments. Article 4, subsection 4–104(1)(k), provides that unaccepted payment orders are deemed rejected at the time a suspension of payments occurs."). *See generally* Baxter & Bhala, *Proper and Improper Execution of Payment Orders*, 45 Bus.Law. 1447, 1462 n. 81 (1990) ("Of course, a suspension of payments also could result from other causes, such as war, or another sovereign act such as an asset freeze.")

count with FABNY and, therefore, acceptance could not have occurred. N.Y.U.C.C. § 4–A–209(3) ("acceptance does not occur ... if the beneficiary of the payment order does not have an account with the receiving bank").[12] Consequently, under either scenario, title would not have passed to BCC Ghana from FABNY nor would it have passed from BOC to FABNY, since an intermediary bank accepts a payment order only upon execution of a payment order. N.Y.U.C.C. § 4–A–209(1). If title were never passed to the insolvent BCCI, CGIET would have standing in this proceeding. Accordingly, CGIET has stated a cognizable claim on the merits sufficient-to warrant denial of the Motion to Dismiss.

## CONCLUSION

For the reasons stated above, it is hereby

**ORDERED** that CGIET's Motion for Leave to File a Surreply Affidavit is **GRANTED;** it is

**FURTHER ORDERED** that the government's Motion to Dismiss CGIET's L–Claim is **DENIED;** and it is

**FURTHER ORDERED** that the government shall file its Answer on before September 15, 1997; and the parties shall meet and confer, filing a Joint Statement in accordance with Local Rule 206 on or before **October 6, 1997.** Upon reviewing the Joint Statement, the Court will issue an appropriate scheduling order.

IT IS SO ORDERED.

12. *See also* N.Y.U.C.C. § 4–A–207(1) ("[I]f, in a payment order received by the beneficiary's bank, the name, bank account number, or other identification of the beneficiary refers to a nonexistent ... account, ... acceptance cannot occur."). While it is not entirely clear that this latter section even applies since CGIET is arguing that BCC Ghana never received a payment order from FABNY in the first place, the Court will consider it as an alternative argument in response to government's assertion that FABNY was acting as the beneficiary bank on behalf of beneficiary BCC Ghana in a cover transaction.