**UNITED STATES of America,**
**Plaintiff,**

**v.**

**William J. McCORKLE, a/k/a William T. McCokle, Chantal McCorkle, Brian Higgins, Sammy Smith, American Empire Management & Development Company, Central Florida Real Estate Guide, Inc., Fortunes in Foreclosures, Inc., Francis Leichman Corporation,**

**MTI Investment, Inc, a/k/a MTI, Inc., Cashflow System, Inc., Cashflow, Inc., Amazing Cashflow, Inc., Pre–Foreclosure Bank Owned Properties, Inc., Synchronol, Inc., Herman Venske, Defendants,**

**Animal Welfare Foundation, Inc., United Parcel Services, Charter Pacific Bank, and C.V. Butler Farms, Inc., Claimants.**

**No. 6:98CR52ORL19C.**

United States District Court,
M.D. Florida.
Orlando Division.

Jan. 11, 2001.

## ORDER

FAWSETT, District Judge.

This cause comes before the Court on the following matters:

(1) Notice of Lorrie Nassofer for Forfeiture of 1996 Black Lexus as to William J. McCorkle, Chantal McCorkle (Doc. No. 593, filed March 15, 1999); the Government's Response to Notice of Forfeiture of 1996 Black Lexus (Doc. No. 595, filed March 15, 1999); Claimant Lorrie Nassofer's Response to Notice of Forfeiture (Doc. No. 838, filed November 22, 1999);

(2) Claimant Charter Pacific Bank's Petition for Hearing to Determine Rights and for an Order Granting Charter Pacific Bank the Amount of $260,583.41 Plus Attorneys' Fees and Expenses as to William J. McCorkle, Chantal McCorkle (Doc. No. 594, filed March 15, 1999); Claimant Charter Pacific Bank's Memorandum of Law as to William J. McCorkle, Chantal McCorkle in Support of Charter Pacific's Petition for Hearing to Determine Rights and for an Order Granting Charter Pacific Bank the Amount of $260,583.41, Attorney's Fees, and Expenses (Doc. No. 832, filed November 19, 2000); the Government's Response as to William J. McCorkle and Chantal McCorkle Regarding Motion for an Order Granting Charter Pacific Bank's Verified Claim to the Amount of $260,583.41 Plus Attorney's Fees and Expenses (Doc. No. 605, filed March 24, 1999);

(3) Claimant United Parcel Services' Motion for a Hearing to Determine Rights and for an Order Granting Claimant United Parcel Services the Amount of $264,096.90 Plus Fees, Costs and Interest as to William J. McCorkle and Chantal McCorkle (Doc. No. 820, filed November 17, 1999);

(4) Claimant C.V. Butler Farms, Inc.'s Petition for Ancillary Hearing as to William J. McCorkle, Chantal McCorkle (Doc. No. 596, filed March 17, 1999); the Government's Response as to C.V. Butler Farm, Inc.'s Petition for Ancillary Hearing (Doc. No. 639, filed April 13, 1999); the Government's Amended Response to Claimant C.V. Butler Farms, Inc.'s Petition for Ancillary Hearing (Doc. No. 732, filed July 21, 1999);

(5) Claimant C.V. Butler Farms, Inc.'s Motion for Relief from Order of Forfeiture Dated February 5, 1999 as to William J. McCorkle and Chantal McCorkle (Doc. No. 848, filed December 2, 1999); the Government's Memorandum of Law in Opposition to Claimant C.V. Butler Farms, Inc.'s Motion for Relief from Order of Forfeiture Dated February 5, 1999 (Doc. No. 850, filed December 7, 1999);

(6) The Report and Recommendation of Magistrate Judge James G. Glazebrook Recommending that the Third Party Petitions Filed by Animal Welfare Foundation, Inc., United Parcel Service and Charter Pacific Bank Be Denied, and C.V. Butler Farm, Inc.'s Petition For Relief From the 2/5/99 Amended Forfeiture Order Be Granted (Doc. No. 889, filed June 22, 2000); and

(7) Claimant Charter Pacific Bank's Objections to the Report and Recommendation Dated June 22, 2000, Recommending Its Third Party Petitions Be Denied (Doc. No. 896, filed July 7, 2000).

### *INTRODUCTION*

Claimants, Animal Welfare Foundation, Inc. ("AWF"), Charter Pacific Bank ("Charter"), United Parcel Service ("UPS"), and C.V. Butler Farms, Inc. ("Butler"), filed Petitions asserting their respective interests in the following property which was listed in an Order of forfeiture dated February 9, 1999:(1) a 1996 black Lexus, VIN JT6HJ88J9T0142709; (2) the contents of certain bank accounts at Charter Pacific Bank, Agoura Hills, California; (3) real property located at 2419 Willie N. Mays Parkway, Orlando, Florida; and (4) cash. *See* (Doc. No. 552).

The Petitions were referred to Magistrate Judge James G. Glazebrook for Report and Recommendation. A hearing was held before Magistrate Judge Glazebrook

on November 22, 1999 regarding the Claimants' Petitions (the "November Hearing"). (Doc. No. 835); (Doc. No. 849, 900 & 920) (Transcripts of November Hearing). Based on the parties' written submissions and the evidentiary hearing on the matter, the Magistrate Judge issued a Report and Recommendation ("Report") recommending that the Petitions of AWF, UPS, and Charter be denied and recommending that Butler's Petition be granted. *See* (Doc. No. 889).

Claimant Charter was the only party to file an objection to the Report.[1] *See* (Doc. No. 896). Consequently, the Court will review the portions of the Report to which Charter objected *de novo. See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72. In this regard, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made" in the Report. *See id.*

## CHARTER PACIFIC BANK

On March 15, 1999, Charter filed a Petition asserting an interest in "$260,583.41 plus additional expenses in United States currency from a total of $1,134,123.94 formerly held in Account Nos. 060–508380, 060–207674, 060–301018, 060–301015, 060–301025, 060–508534, AND 060–207763, located at Charter (the "Accounts")." *See* (Doc. No. 594, at 1). In its Petition, Charter claimed that it "was an innocent lienholder" when the Government seized the funds held in the Accounts, and that it "still has a perfected security interest in

the funds." *Id.* Charter further stated that "[a]s a result of the United States' seizure of funds related to Cashflow Systems held [in the Accounts], Charter incurred liabilities of $260,583.41 to cover responsibilities of Cashflow Systems." *Id.* at 2–3 (explaining that the moneys were paid to "consumer who sought refunds from products they purchased from Cashflow Systems"). Finally, Charter requested compensation for the "incurred losses in the form of attorneys' fees and additional expenses which were specifically agreed by contract to be the responsibility of Cashflow Systems." *Id.* at 3. As stated above, Magistrate Judge Glazebrook recommended that Charter's Petition be denied.

Charter objects to the following findings of fact in the Report: (1) the finding that its "decision to continue doing business with the McCorkles after the seizure caused it to use its own funds to pay chargebacks in the amount of $260,583.41;"[2] (2) the finding that Charter "knew that Old Kent Bank had terminated Cashflow Systems, Inc.'s merchant account because of excessive chargebacks;" and (3) the suggestion that Charter was "eager to help" the McCorkles continue their fraud. *See* (Doc. No. 896, at 8–11).

Charter also objects to legal conclusions reached in the Report. First, Charter argues that the Report's conclusion that Charter had not "perfect[ed] its security interest in the account" is incorrect under California law.[3] *See id.* at 12–13. Second,

---

1. The Government did not respond to Charter's Objections. *See* Local Rule 3.01(b).

2. Charter contends that the uncontested evidence presented at the November Hearing established that Charter's "loss was caused by valid chargebacks arising from pre-seizure transactions that Charter was responsible to pay pursuant to its agreements with Master-Card and Visa." *See id.* at 8–9.

3. Previously, Charter's representative made statements contradicting its current position.

The Government's asked Miss Khatib, on behalf of Charter: "And isn't it correct that the bank has no ownership of the money in the reserve account?" Miss Khatib responded: "No, we don't own those monies. They're still in the name of the merchant account. However, the merchant does not have signature on that account." (Doc. No. 605, Exh. G, at 260) (Transcript of Hearing). In addition, the Court asked: "Miss Khatib, ... you've got what in effect is a security interest in that money, you've got it as collateral for a

Charter objects to the conclusion in the Report that, "under the relation-back doctrine," the Government's interest in the seized funds vested on July 26, 1996. *Id.* at 15. Charter's third objection is to the Court's reliance on Charter's due diligence in finding that Charter had not met its burden under section 853(n)(6)(B).[4] *Id.* at 18.

After considering the record before the Court and the applicable law, the Court finds that the Magistrate Judge's thorough, well-reasoned opinion correctly states the law applicable in this case. Furthermore, any error in the findings of fact set forth in the Report did not alter the proper result.[5] As a result, the Court adopts, affirms, and approves the Report, including its conclusion that Charter's Petition should be denied.[6] The Court finds that the Report is correct with regard to the remaining parties as well.

In light of the Court's ruling regarding claimant Butler, the February 9, 1999 Order of Forfeiture must be amended. *See* 21 U.S.C. §§ 853(n)(6)(A) & (B). The February 9, 1999 Order of Forfeiture will be amended to reflect Butler's mortgage lien of $8,267.99 plus interest on the 2419 Willie N. Mays property.

## CONCLUSION

Based upon the foregoing, the Court rules that:

(1) The Report and Recommendation Dated June 22, 2000 Recommending that the Third Party Petitions Filed by Animal Welfare Foundation, Inc., United Parcel Service and Charter Pacific Bank Be Denied, and C.V. Butler Farm, Inc.'s Petition For Relief From the 2/5/99 Amended Forfeiture Order Be Granted (Doc. No. 889) is **ADOPTED, AFFIRMED, AND APPROVED.**

(2) Notice of Lorrie Nassofer for Forfeiture of 1996 Black Lexus as to William J. McCorkle, Chantal McCorkle (Doc. No. 593) is **DENIED.**

(3) Claimant Charter Pacific Bank's Petition for Hearing to Determine Rights and for an Order Granting Charter Pacific Bank the Amount of $260,583.41 Plus Attorneys' Fees and Expenses as to William J. McCorkle, Chantal McCorkle (Doc. No. 594) is **DENIED.**

(4) Claimant United Parcel Services' Motion for a Hearing to Determine Rights and for an Order Granting Claimant United Parcel Services the Amount of $264,096.90 Plus Fees, Costs and Interest

---

potential obligation that the merchant may have?" On behalf of Charter, Miss Khatib responded: "Yes." *Id.* at 263–64.

4. Charter acknowledges that "it possessed certain knowledge as a result of its due diligence, but it did not, and in fact could not, reasonably become aware that Cashflow's funds would be subject to forfeiture." *Id.* at 18.

5. For instance, the Court agrees that Charter's losses were not wholly caused by its decision to continue doing business with the McCorkles after the initial seizure. To the extent the Report makes an incorrect finding of fact in this regard, it is irrelevant to the correct conclusion of law in the Report that the Government's interest in the forfeited

funds was superior to Charter's later-acquired interest.

6. Upon consideration of essentially these same legal arguments, Magistrate Judge Baker concluded that Charter had only a "tenuous" interest in the accounts. Specifically, Magistrate Judge Baker found that "[t]he accounts are not owned by the Bank, but are, at best, collateral for potential obligations which may arise in the future." *See* (Doc. No. 605, Exh. E, at 5). United States District Judge G. Kendall Sharp agreed that the Court did not have jurisdiction over Charter's claim. *See id.* at Exh. F (endorsing Magistrate Judge Baker's Report). Thus, two United States Magistrate judges and another United States District Judge have rejected Charter's arguments.

as to William J. McCorkle and Chantal McCorkle (Doc. No. 820) is **DENIED.**

(5) Claimant C.V. Butler Farms, Inc.'s Petitions (Doc. No. 596 and 848) are **GRANTED.**

### *REPORT AND RECOMMENDATION*

GLAZEBROOK, United States Magistrate Judge.

This cause came on for an evidentiary hearing on November 22, 1999 on the following third party petitions, claiming property that was ordered forfeited in this criminal case:

**PETITION: PETITION OF THE AN-IMAL WELFARE FOUNDATION, INC. [Docket Nos. 593, 838]**
**FILED: March 15, 2000, and amended on November 22, 2000**
**RECOMMENDATION: DENIED.**
**PETITION: PETITION OF UNITED PARCEL SERVICE [Docket No. 820]**
**FILED: November 17, 1999**
**RECOMMENDATION: DENIED.**
**PETITION: PETITION OF C.V. BUTLER FARMS, INC. [Docket Nos. 596, 848]**
**FILED: March 15, 2000, and amended on December 2, 1999**
**RECOMMENDATION: GRANTED.**
**PETITION: PETITION OF CHAR-TER PACIFIC BANK [Docket No. 594]**
**FILED: March 15, 2000**
**RECOMMENDATION: DENIED.**

### I. *PROCEDURAL HISTORY*

On May 9, 1997, federal agents seized certain property of William J. McCorkle, Chantal McCorkle and their ten corporations. The property seized included business and other records, money located in various bank accounts, cars, and other property seized for evidentiary and forfeiture purposes. On March 5, 1998, the Grand Jury returned a 54–page indictment charging the McCorkles, and their ten corporations, including Cashflow, Inc. and Cashflow System, Inc., with ninety felony counts, including conspiracy, mail fraud, credit card fraud, perjury, and money laundering. Docket Nos. 1 (indictment) and 76 (superseding indictment). The indictment charged that the McCorkles operated a nationwide telemarketing fraud from June 1, 1992 through July 21, 1997, in violation of 18 U.S.C. §§ 1341 and 1343. The indictment detailed the McCorkles' many false representations, promises, and deceptive practices in selling videos and related materials to customers. The indictment also charged that the McCorkles had represented that customers could make enormous profits using the McCorkle method of investing in "pre-foreclosed" and "distressed" real estate, and had promised that McCorkle would partner deals with customers using the McCorkles' money. Docket No. 1. The indictment also charged that the McCorkles had laundered and conspired to launder telemarketing fraud proceeds in violation of 18 U.S.C. §§ 1956—57 from July 26, 1996 through July 2, 1997. Docket No. 76 at 29.

The indictment contained a forfeiture count alleging that any proceeds that the McCorkles obtained from the fraud and money laundering was forfeitable to the United States. Docket No. 76 at 53. The indictment also stated the government's intent to seek forfeiture of any other substitute property of the defendants under 18 U.S.C. § 982(b)(2), if the specified property cannot be located, has been transferred or sold to, or deposited with a third party. Docket No. 76 at 53—54. Federal law enforcement agents arrested the McCorkles on March 10, 1998. Docket Nos. 45, 46. On November 4, 1998, a jury found William J. and Chantal McCorkle guilty of numerous fraud and money laundering violations. Docket No. 392—93.

After convicting the McCorkles, the jury listened to the Court's instruction on forfeiture, and returned a special verdict finding that certain real and personal property, including numerous bank accounts, were involved in, traceable to, or facilitated the fraud and laundering violations charged in the indictment and, thus, were subject to forfeiture. Docket No. 412. The Court denied the McCorkles' motion for acquittal on the forfeiture count. Docket No. 451.

On February 9, 1999, the Court entered an amended preliminary order of forfeiture, which listed certain real and personal property now at issue, including: 1.) a 1996 black Lexus, VIN JT6HJ88J9T0142709; 2.) the contents of certain bank accounts at Charter Pacific Bank, Agoura Hills, California; 3.) real property located at 2419 Willie N. Mays Parkway, Orlando, Florida; and 4.) cash. Docket No. 552. The Court authorized the publication of notice requiring persons who claim any right, title, or interest in the listed property to file a petition in the district court. Docket No. 552.

Multiple third-parties, including claimants Animal Welfare Foundation, Inc., Charter Pacific Bank, and C.V. Butler Farms, Inc., filed timely petitions in the district court seeking to adjudicate the validity of their interest in the forfeited property in accordance with 21 U.S.C. § 853(n)(2). *See* Docket Nos. 593, 594, 596, and 848. UPS filed an untimely petition. *See* Docket No. 820. On November 22, 1999, the Court held a full adversarial hearing to resolve these four petitions.

## II. *THE LAW GOVERNING CRIMINAL FORFEITURE*

In imposing a sentence for violating 18 U.S.C. §§ 1956—57 (money laundering), the district court must order forfeiture to the United States of any property involved in the money laundering offense, or any property traceable to such property. 18 U.S.C. § 982(a)(1). Congress has specified the procedure for the district courts to follow in the forfeiture, seizure, and disposition of such property. 18 U.S.C. § 982(b)(1) (1998); 21 U.S.C. § 853(a)—(c), (e)—(q) (1996).

Congress has prescribed the means for execution on forfeited property. Upon entry of an order of forfeiture, the district court shall authorize the Attorney General to seize all property ordered forfeited upon such terms and conditions as the court deems proper. 21 U.S.C. § 853(g). The district court may, upon application of the United States, take any action to protect the interest of the United States in the property ordered, including the requirement of a bond. 21 U.S.C. § 853(g). Congress has conferred jurisdiction on the district courts to enter orders concerning forfeiture without regard to the location of the forfeited property. 21 U.S.C. § 853(*l*).

The United States Congress has enacted legislation vesting all right, title, and interest in laundered fraud proceeds and other property in the United States upon commission of the act giving rise to the forfeiture, *i.e.*, the acts of money laundering. 21 U.S.C. § 853(c). Any laundered property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture. 21 U.S.C. § 853(c). The district court thereafter orders the laundered property forfeited to the United States unless the transferee establishes in a hearing pursuant to 21 U.S.C. § 853(n) (third party interests) that he has a valid interest in the property forfeited. 21 U.S.C. § 853(c).

Congress has established the procedure for adjudicating third party interests in forfeited property. 21 U.S.C. § 853(n). A petitioner must follow the specified procedure, and may not commence a separate

action against the United States concerning the validity of his alleged interest in the forfeited property. 21 U.S.C. § 853(k). Any person asserting a legal interest in property that has been ordered forfeited must petition the court for a hearing to adjudicate the validity of his alleged interest. The petition must set forth, under penalty of perjury, the nature and extent of his right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of that interest, any additional facts supporting the petitioner's claim, and the relief sought. 21 U.S.C. § 853(n).

▇ The district court then holds a hearing on the petition or petitions, to the extent practicable, within thirty days of filing. 21 U.S.C. § 853(n)(2), (4). The petitioner may testify and present testimony and other evidence. The Court also considers the relevant portions of the record in the criminal case. 21 U.S.C. § 853(n)(5). The Court will amend the order of forfeiture after the hearing if it determines that the petitioner has established by a preponderance of the evidence that he has a legal right, title, or interest in the property that renders the order of forfeiture invalid because the petitioner's title was superior to that of the defendant at the time of the criminal acts. 21 U.S.C. § 853(n)(6)(A). To show superior interest under § 853(n)(6)(A), the petitioner must prove that the interest claimed is a legitimate interest, received for consideration, and not as a result of a sham transaction. *See Decker v. United States,* 837 F.Supp. 1148, 1153 (M.D.Fla.1993).

Similarly, the Court will amend the order of forfeiture if it determines that the petitioner has established that he is a bona fide purchaser for value of the right, title, or interest in the property, and was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture. 21 U.S.C. § 853(n)(6)(B). The

Court will order the forfeiture of any other property of the defendant if the laundered property cannot be located, has been transferred to or deposited with a third party, or has been placed beyond the jurisdiction of the Court as a result of any act or omission of the defendant. 21 U.S.C. § 853(p).

▇ As a rule, general creditors have no claim to forfeited assets because they have no identifiable "right, title, or interest" under § 853(n)(6), and no identifiable "legal interest" under § 853(n)(2). *United States v. Ribadeneira,* 105 F.3d 833, 834—37 (2d Cir.1997) (general creditors lacked standing to contest order of forfeiture); *United States v. BCCI Holdings (Luxembourg), S.A.,* 46 F.3d 1185, 1191–92 (D.C.Cir.1995) (general creditors failed to state a claim under RICO forfeiture statute "identical" to § 853(n)); *United States v. Campos,* 859 F.2d 1233 (6th Cir.1988) (general creditors failed to state a claim under § 853(n)(6)). To prevail under § 853(n)(6)(A), a claimant's legal right, title, or interest in the forfeited property must either be "vested" in the petitioner, or be "superior" to any right, title or interest of the defendant. *Campos,* 859 F.2d at 1238—39; *see also BCCI,* 46 F.3d at 1191. A general creditor has no "vested" or "superior" interest in particular assets forfeited unless he not only has secured a judgment against the debtor, but also has perfected a lien against a particular item. *BCCI,* 46 F.3d at 1191; *accord Ribadeneira,* 105 F.3d at 836. The Eleventh Circuit has not addressed the issue of whether a general or unsecured creditor may qualify as a bona fide purchaser under § 853(n)(6)(B).

▇ The United States Court of Appeals for the Fourth Circuit, however, has not applied the general rule agreed upon by the Second, Sixth, and D.C. Circuits. According to the Fourth Circuit in *Reck-*

*meyer*, general creditors who hold no security interest in specified assets nevertheless have a "legal interest" in property which has been ordered forfeited within the meaning of § 853(n)(2), because they may "reduce their claims" to judgment and thereby acquire a lien on all of the debtor's assets. *United States v. Reckmeyer*, 836 F.2d 200, 205—08 (4th Cir.1987). Where the government has seized all known assets of the defendant's estate, a general creditor's "legal interest must necessarily lie within the forfeited estate." *Reckmeyer*, 836 F.2d at 206; *see also United States v. Mageean*, 649 F.Supp. 820 (D.Nev.1986), *aff'd*, 822 F.2d 62 (9th Cir.1987).

 *Reckmeyer* is wrong. This Court applies the majority rule in agreement with the Second, Sixth, and D.C. Circuits—that unsecured creditors are not bona fide purchasers under § 853(n)(6)(B). *See United States v. Ribadeneira*, 105 F.3d 833 (2d Cir.1997); *United States v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185 (D.C.Cir.1995); *United States v. Campos*, 859 F.2d 1233 (6th Cir.1988). This Court adopts the reasoning articulated by the District of Columbia Circuit in *BCCI Holdings*. That court rejected *Reckmeyer's* holding,[1] and dismissed the third-party petitioners' claims to a defendant's forfeited assets:

[A] general creditor can never have an interest in specific forfeited property, no matter what the relative size of his claim vis-a-vis the value of the defendant's post-forfeiture estate. Were it otherwise, the court litigating the forfeiture issue would be converted into a bankruptcy court and would not be able to grant forfeiture to the government until it determined that no general creditor would be unable to satisfy its claim against the defendant. That result appears patently at odds with the statutory scheme, which directs parties without an interest in specific property to seek relief from the Attorney General, not the court adjudging the forfeiture. The Attorney General has the authority to dispense confiscated funds "to protect the rights of innocent persons," 18 U.S.C. § 1963(g)(1), and general creditors seem precisely the type of innocent persons Congress had in mind.

*BCCI Holdings*, 46 F.3d at 1191–92.[2] There simply is no convincing basis for concluding that Congress intended an unsecured creditor's interest in general forfeited property, as opposed to a specific forfeited property, to defeat the government's interest.

*Reckmeyer* not only disregards the statute's "in *the* property" language in §§ 853(n)(2) and (n)(6)(B), but also improperly construes the term "bona fide purchasers for value," to include a general creditor. Under *Reckmeyer's* analysis, all

---

1. *The BCCI Holdings* case involved forfeiture of assets under 18 U.S.C. § 1963(*l*), a provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). However, the RICO forfeiture provisions and those involved in the instant matter "are so similar in legislative history and plain language as to warrant similar interpretation." *United States v. Ribadeneira*, 105 F.3d 833, 835 n. 2 (2d Cir.1997) (citing *United States v. Ripinsky*, 20 F.3d 359, 362 n. 3 (9th Cir.1994); *see also United States v. Lavin*, 942 F.2d 177, 185 n. 9 (3rd Cir.1991) (noting that § 1963(*l*) and § 853(n) are identical and using § 1963(*l*)'s legislative history as a guide to interpreting § 853(n)).

2. Like 18 U.S.C. § 1963(g)(1), under 21 U.S.C. § 853(i)(1) an unsecured judgment or general creditor has the right to file for remission or mitigation of forfeiture under the Department of Justice's regulation governing such procedures. *See* 28 C.F.R. § 9.6(a). The fact that a claimant has no legal or equitable interest in forfeited property under the criminal forfeiture statute does not preclude remission or mitigation where provisions of the regulation can be met and where principles of fairness so dictate.

innocent creditors are bona fide purchasers—a position that is contrary to the natural meaning of what Congress said. *See Campos*, 859 F.2d at 1237–38 (holding that unsecured creditors do not fit the traditional definition of "bona fide purchasers").

## III. *APPLICATION*

### A. Petition of the Animal Welfare Foundation, Inc.

■ After the criminal trial, the jury determined that a 1996 black Lexus, VIN JT6HJ88J9T0142709, was involved in, traceable to, or facilitated the McCorkles' fraud and money laundering. Docket No. 412. The 1996 black Lexus was then forfeited to the United States pursuant to the Court's amended preliminary order of forfeiture. Docket No. 552. On March 15, 1999, the Animal Welfare Foundation, Inc. ("Animal Foundation"), through its President, Lorrie Nassofer,[3] filed a petition alleging that the Animal Foundation owned the 1996 black Lexus. *See* Docket No. 593, as amended by Docket No. 838. On March 15, 1999, the government filed its opposition to the Animal Foundation's third party claim. Docket No. 595.

During the November 22, 1999 hearing, Nassofer testified that William McCorkle had given the Lexus to the Animal Foundation as a "gift" on June 3, 1997. The Lexus was titled in the name of the Animal Foundation. Nassofer also testified that McCorkle continued to drive the Lexus regularly after June 3, 1997, until he was convicted on March 8, 1998. The government alleged and proved that McCorkle had titled the Lexus in the name of the Animal Foundation as a nominee in order to conceal his ownership and use of the vehicle.

■ Even if McCorkle had given the Lexus to the Animal Foundation, it is not sufficient to prove that the Animal Foundation received the Lexus as a gift. In order to obtain relief from the order of forfeiture, the Animal Foundation must demonstrate, by a preponderance of the evidence: 1.) that it is a bona fide purchaser of the Lexus for value; or 2.) that its interest in the Lexus was superior to McCorkle's interest at the time the McCorkles committed the illegal money laundering in July 1996. *See* 21 U.S.C. § 853(n)(6)(A)—(B). The Animal Foundation failed to prove either basis for its claim to the Lexus.

The Animal Foundation does not qualify as a bona fide purchaser. Rather, it concedes that it did not give any value for the Lexus. Similarly, the Animal Foundation failed to demonstrate an interest in the Lexus that was superior to that of the McCorkles at the time the interest vested in the United States, *i.e.*, at the time of the commission of the acts first giving rise to its forfeiture. In this case, the McCorkles' money laundering violations began in June 1996. The alleged "gift" to the Animal Foundation was on June 3, 1997. Docket No. 593. The Animal Foundation was nothing more than a McCorkle nominee for holding title to the Lexus. McCorkle used the nominee to protect against detection and seizure by creditors and law enforcement as he perpetuated the fraud. A failure to look beyond bare legal title would further encourage con-men to manipulate nominal ownership in order to avoid the consequences of forfeiture. *United States v. Premises Known as 526 Liscum Drive*, 866 F.2d 213, 217 (6th Cir. 1989). The Animal Foundation is not enti-

---

**3.** Seven days after the seizure on May 9, 1997, William McCorkle used Lorrie Nassofer to open a merchant account at SunTrust Bank to process over $750,000 in telemarket-

ing sales for McCorkle. *See United States of America v. McCorkle, et al.*, Case No. 6:98–cr–52–Orl–19C, 2000 WL 133759, *16 (M.D.Fla. Jan.14, 2000).

tled to relief under 21 U.S.C. § 853(n)(6)(A) or (B). Accordingly, the Animal Foundation's petition [Docket No. 593, as amended by Docket No. 838] should be **DENIED.**

### B. Petition of United Parcel Service

■ The McCorkles used United Parcel Service ("UPS") to ship material relating to Cashflow, Inc.'s and Cashflow System, Inc.'s businesses. On November 17, 1999, UPS filed a petition, claiming title to $264,096.90 in unspecified assets or funds that had been forfeited to the United States pursuant to the Court's preliminary and amended orders of forfeiture. Docket No. 820. UPS claimed that defendants Cashflow, Inc. and Cashflow System, Inc. still owed UPS $204,931.79 for unpaid shipping services. On October 1997, UPS sued Cashflow, Inc. and Cashflow Systems, Inc. in state court for the unpaid balance. On July 26, 1999, UPS obtained a judgment against Cashflow, Inc. and Cashflow Systems, Inc. in the amount of $264,-096.90—an amount that includes court costs, attorneys' fees, and prejudgment interest. UPS now seeks payment of its judgment (including court costs, attorneys' fees and prejudgment interest) against Cashflow, Inc. and Cashflow System, Inc. out of unspecified McCorkle assets that have been forfeited to the United States.

UPS' petition should be denied as untimely. Pursuant to 21 U.S.C. § 853(n), a third party asserting a legal interest in property that has been ordered forfeited must petition the court for a hearing to adjudicate the validity of his alleged interest in the property within thirty days of the final publication of notice or his receipt of notice of the forfeiture. 21 U.S.C. § 853(n)(2). UPS received written notice, received notice by publication, and received actual notice through its attorney no later than March 1999, yet failed to file a claim until November 17, 1999. UPS is represented by counsel, and has failed to show any excusable neglect for its untimely petition. Accordingly, UPS' petition should be **DENIED** as untimely.

■ Alternatively, UPS' petition should be denied on the merits. The petition fails to assert a legally cognizable claim for which relief may be granted under 21 U.S.C. § 853(n)(6)(A) or (B). UPS does not have a superior right, title, or interest in any of the forfeited property, in any form, and is not a bona fide purchaser for value of any of the forfeited property. Although UPS obtained a judgment against Cashflow, inc. and Cashflow System, Inc. in June 1999, UPS did not perfect a lien or otherwise secure an interest in any specific property that was seized from the various defendants. As UPS admitted during the November 22, 1999 hearing, UPS is no more than an unsecured judgment creditor.

UPS concedes that it cannot recover under 21 U.S.C. § 853(n)(6)(A), which requires a showing of a "vested" interest or a "superior" right in the property forfeited. 21 U.S.C. § 853(n)(6)(A). A general unsecured debt is not a vested interest. *United States v. Campos,* 859 F.2d 1233, 1238 (6th Cir.1988) (debt of a trade creditor and money owed to an employee did not create vested rights under § 853(n)(6)(A)). Moreover, under § 853(n)(6)(A)'s "relation-back" provision, the government's interest in the forfeited monies vested on July 26, 1996, when defendants first committed the crimes giving rise to the forfeiture. Those crimes were completed on July 2, 1997, long before UPS obtained its June 1999 judgment against Cashflow, Inc. and Cashflow System, Inc.

UPS asserts, however, that it is a bona fide purchaser for value under 21 U.S.C. § 853(n)(6)(B) that is entitled to recover forfeited assets equal to the debt owed by Cashflow, Inc. and Cashflow System, Inc.

UPS argues that it can prevail under § 853(n)(6), because the McCorkles' entire estate has been forfeited to the government and, therefore, UPS' interest necessarily (and· generally) extends to a portion of the estate forfeited to the government. *See United States v. Reckmeyer*, 836 F.2d 200 (4th Cir.1987). As stated above, this argument lacks merit.

UPS does not claim to have a perfected a judgment lien against particular assets. As a general judgment creditor, UPS has no interest in any particular item, but only in the estate of Cashflow, Inc. and Cashflow System, Inc. as a whole. *See Campos*, 859 F.2d at 1240. Because UPS has not demonstrated an identifiable "legal interest" under § 853(n)(2) in any particular item forfeited; has not demonstrated an identifiable "right, title, or interest" under § 853(n)(6); has not demonstrated a "vested" or "superior" right under § 853(n)(6)(A); has not demonstrated an interest *in the* property under § 853(n)(6)(B); and has not demonstrated an interest in forfeited property beyond that of a general creditor, the Court finds that UPS does not qualify as a bona fide purchaser of the forfeited property. UPS' petition should be **DENIED.**

## C. Petition of C.V. Butler Farms, Inc.

█ On November 5, 1998, the jury returned a special verdict finding that the real property (a residence) located at 2419 Willie N. Mays Parkway, Orlando, Florida was involved in, traceable to, or facilitated the McCorkles' fraud and money laundering violations. Docket No. 412. After the Court entered its February 5, 1999 order of forfeiture, two parties filed petitions in the district court seeking to adjudicate their interests in the 2419 Willie N. Mays property. First, on March 17, 1999, C.V. Butler Farms, Inc. ("C.V. Butler") filed a petition, claiming a mortgage lien on the property. *See* Docket Nos. 596, 848.

Second, at the November 22, 1999 hearing, Mae Francis, an aging African–American woman unrepresented by counsel, orally claimed that she is the rightful owner of the residence and real property at 2419 Willie N. Mays. The United States endorsed Francis' oral claim, and urged this Court to grant it. C.V. Butler stated that it did not oppose Francis' claim to title. No party challenged the timeliness or oral form of the petition. Because the government and Francis were able to resolve Francis' claim to title in her favor without Court intervention, this Court denied Francis' claim as moot. Docket No. 845.

Francis owned the residence at 2419 Willie N. Mays from July 1969 until January 1988. In January 1988, Francis' property was in financial distress and subject to foreclosure. As part of their telemarketing fraud, the McCorkles bought "distressed" real estate that was subject to foreclosure. On January 29, 1988, William McCorkle induced Francis to transfer title of her residence to him. McCorkle promised to save the house from foreclosure, and promised to then rent it back to Francis with an option to repurchase the house at a future date. Francis did not know that McCorkle planned to obtain a personal loan for himself, secured by a mortgage on her property. Francis did not know that McCorkle would charge her almost double her previous mortgage payments as rent, and that McCorkle was free to dispose of the property and to keep the profit if she defaulted on her rent. On January 29, 1988, Francis executed a warranty deed conveying her house to McCorkle. On February 3, 1988, McCorkle recorded the deed in Orange County, Florida.

On January 28, 1988, McCorkle obtained a loan from C.V. Butler in the amount of $8,500, and gave C.V. Butler a promissory note in exchange. McCorkle also con-

veyed a security interest in the residence to C.V. Butler in the form of a mortgage. C.V. Butler is in the business of lending money, and knew nothing of McCorkle's fraud or money laundering. C.V. Butler recorded the mortgage on February 3, 1988. The promissory note required McCorkle to make equal monthly payments of principal and interest in the amount of $128.11, commencing on the 28th day of each month until paid in full. McCorkle defaulted on the loan in March 1998 when McCorkle was indicted. On February 5, 1999—the date this Court issued the amended preliminary order of forfeiture—the principal amount due on the note was $8,267.99, together with interest in the amount of $408.

At the November 22, 1999 hearing, the government claimed that McCorkle had obtained the residence and property at 2419 Willie N. Mays Parkway by fraud, and that the transfer from Francis to McCorkle was void *ab initio*. The government further argued that McCorkle had conveyed no security interest or other legal interest in the property because C.V. Butler could not obtain a valid interest from a thief. Although C.V. Butler did not object to Francis' claim of ownership of the property, it argued that the order of forfeiture should be amended to reflect its mortgage lien of $8,267.99 plus interest on the 2419 Willie N. Mays property because C.V. Butler held a secured interest in the property superior to McCorkle under 21 U.S.C. § 853(n)(6)(A). This Court agrees.

C.V. Butler prevails on its claim under § 853(n)(6)(A). C.V. Butler demonstrated that its mortgage was part of a legitimate transaction, that C.V. Butler received the mortgage security interest as consider-

ation for the loan, and that C.V. Butler was not participating in a sham transaction to further McCorkle's fraudulent scheme. C.V. Butler proved that it was not aware of any criminal activity on the part of McCorkle until he was indicted—about when the payments on the note ceased. In addition, the mortgage between McCorkle and C.V. Butler was a legitimate transaction, supported by a recorded mortgage and note. C.V. Butler also made attempts to collect past due sums. Moreover, the mortgage was prepared, executed, and recorded in a manner which is fully consistent with legitimate business practices. C.V. Butler obtained a valid perfected security interest on February 3, 1988 when the mortgage on the 2419 Willie N. Mays property was duly recorded in the public records of Orange County, Florida.

This Court rejects the government's argument that C.V. Butler cannot prevail pursuant to § 853(n)(6)(A) due to the "relation-back" provision. The government's theory fails to consider § 853(n)(6)(A) in full. Under § 853(n)(6)(A)'s "relation-back" provision, the government's interest in the forfeited property vested at the "time of the commission of the acts which gave rise to the forfeiture of the property." The act which gave rise to the forfeiture of the property was not the single uncharged act of fraud committed by McCorkle on Francis in 1988. Rather, as charged in the indictment, the specified unlawful activity which produced proceeds for laundering was the McCorkles' fraudulent telemarketing scheme. The fraud began in June 1, 1992—not in January 1988. Docket No. 78. The charged money laundering which resulted in the forfeiture began even later—on July 26, 1996.[4] Docket No. 76 at

---

4. The government has not explained how the 2419 Willie N. Mays property became subject to forfeiture as a result of money laundering acts in 1996. Presumably, the property was forfeited under 18 U.S.C. § 982(b)(2) as sub-

stitute property. In any event, the jury verdict so finds, Docket No. 412, and this petition presents this Court with no reason to seek further explanation.

29. C.V. Butler's June 1988 mortgage lien on the property was superior to that of the McCorkles in July 1996 when the McCorkles began committing the money laundering acts that gave rise to the forfeiture.

In addition, C.V. Butler is entitled to relief from the Court's forfeiture order under § 853(n)(6)(B). This Court rejects government's claim that the transfer of the property from Francis to McCorkle is *void ab initio* due to the fraud perpetrated on Francis by McCorkle; that the interest in the property never vested in McCorkle; and that the mortgage lien that C.V. Butler recorded on the property never attached. Rather, C.V. Butler's interest arose after McCorkle had obtained legal title to the property.

■■■ As a general rule, a buyer acquires no better title than that of the seller. *United States v. Lavin,* 942 F.2d 177, 185 (3rd Cir.1991), *citing* UCC § 2–403(a) ("a purchaser of goods acquires all title which his transferor had power to transfer"). However, a person with voidable title has power to transfer a good title to a buyer who is good faith purchaser for value. *See* UCC § 2–403(a). The good faith purchaser exception promotes finality in commercial transactions, and thus encourages purchases and fosters commerce. 942 F.2d at 185. It does so by protecting the title of a purchaser who acquires property for valuable consideration, and who is without notice at the time of the purchase that the seller lacks valid and transferable title in the property. In *Johnson & Johnson Products, Inc. v. Dal International Trading Co.,* 798 F.2d 100, 104 (3d Cir. 1986).

It is easy to understand why Congress would choose to take the good faith purchaser doctrine in UCC § 2–403 and codify it in 21 U.S.C. § 853(n)(6)(B). Section 853(n)(6)(B) ensures that, if a defendant transfers the forfeitable property for value to a purchaser, who at the time of the purchase knew nothing of the government's forfeitable interest in the property, the government may not later take the property away from the innocent purchaser. Extension of the good faith purchaser exception to the forfeiture context facilitates commerce, as it does in the general commercial law context, by removing an impediment to commercial transactions— namely, the need for a purchaser to engage in exhaustive research in order to discover whether there are competing claims to the property prior to consummating a sale. 942 F.2d at 186. This Court will not hold good faith lenders strictly liable for knowing of the borrower's felonies. Congress has required only that the claimant be "reasonably without cause to believe that the property was subject to forfeiture." 21 U.S.C. § 853(n)(6)(B).

C.V. Butler is a bona fide purchaser for value of the secured mortgage interest in 2419 Willie N. Mays in the amount of $8,267.99 plus interest, and was reasonably without cause to believe that the property was subject to forfeiture. In early 1988, C.V. Butler provided value of $8,500 for the 2419 Willie N. Mays mortgage interest. Surely, at the time of "purchase" in January or February 1988, C.V. Butler was without cause to believe that the property was subject to forfeiture as the result of money laundering that would not begin for another eight years. Accordingly, C.V. Butler's petition should be **GRANTED.** The Attorney General may exercise her discretion under 21 U.S.C. § 853(i) to pay C.V. Butler's interest out of the government's assets if appropriate.

**D. Petition of Charter Pacific Bank**

■■■ In Autumn 1996, the McCorkles' infomercials produced millions of dollars in fraud proceeds each month. When credit card customers learned of the fraud, they "charged back" their credit cards to obtain

a refund credit. Cashflow's merchant bank, Old Kent Bank, had terminated the McCorkle's merchant account for excessive chargebacks [Docket No. 849 at 100—101; GX 28 at 111], and the McCorkles were desperate to find a new merchant bank to allow them to continue the fraud. [Docket No. 849 at 100—101; GX 28 at 111] Charter Pacific Bank ("Charter Pacific") in Agoura Hills, California was eager to help.[5]

On October 1, 1996, Cashflow System, Inc, through its President, Chantal McCorkle, applied for a merchant account at Charter Pacific, for the purpose of processing and collecting Visa and MasterCard credit card transactions arising from Cashflow System, Inc.'s mail and telephone orders. *See* GX 29; Docket No. 849 at 66. Chantal McCorkle personally guaranteed the account. GX 29 at 3. Cashflow System, Inc.'s application told Charter Pacific that Cashflow System, Inc.'s sales originated from infomercials touting "real estate course" packages (video and written materials). GX 29 at 1. Charter Pacific knew that Cashflow System, Inc. claimed $5,000,000 to $6,000,000 a month in total sales. GX 29 at 2.

In reviewing and processing Cashflow System, Inc.'s application, Charter Pacific conducted a substantial due diligence inquiry that included an examination of Cashflow System, Inc.'s business operation and financial viability. GX 28 at 104—105, 107, 124; Docket No. 849 at 95. As part of this inquiry, Charter Pacific reviewed the infomercial being aired by the McCorkles at the time. GX 28 at 110. The infomercial showed the McCorkles on a yacht bearing the name "William J. McCorkle," in a private plane, in front of a luxury house, and in a helicopter. The infomer-

cial contained representations of "fortunes in foreclosures," and included testimonials from the McCorkles and others regarding the financial success that results from buying and following the McCorkles' plan. In the infomercials, the McCorkles presented themselves as multi-millionaires based on their successful investments in real estate. The promise of timely refunds was a prominent part of the McCorkles' infomercial.

As part of its due diligence inquiry, Charter Pacific also examined Cashflow System, Inc.'s prior banking relations, tax returns, financial statements, and sales records. GX 28 at 124, 128; Docket No. 849 at 96—97. Significantly, Charter Pacific knew that Old Kent Bank had terminated Cashflow System, Inc.'s merchant account because of excessive chargebacks. Docket No. 849 at 100—101; GX 28 at 111. Charter Pacific knew that Chantal McCorkle had answered "no" when asked in the application form whether Cashflow System, Inc.'s merchant account had been previously terminated by a bank. *See* GX 29 at 3.

In reviewing the tax returns, Charter Pacific knew or should have known that Cashflow System, Inc. had filed no tax returns for 1988, 1989, 1990, 1991, 1992, 1993, and 1996, the year it began its arrangement with Charter Pacific. Docket No. 849 at 98. Moreover, Cashflow System Inc.'s 1994 tax return showed a loss of $36,882 and its 1995 tax return showed no taxable income. Docket No. 849 at 99. Cashflow System, Inc. had no financial statements corroborating Cashflow System, Inc.'s stated sales of $5,000,000 to $6,000,000 per month. *See* Docket No. 849 at 104. Chantal McCorkle, the president of Cashflow System, Inc. and guarantor,

---

5. The record shows that Homboldt Bank also may have served as Cashflow System, Inc.'s Visa and MasterCard credit card processor. GX 28 at 111—112. However, the record also indicates that Cashflow was having problems with that merchant bank as well. GX 28 at 112.

also had no financial statements reflecting her financial qualifications to act as guarantor for Cashflow System, Inc. Docket No. 849 at 161. Charter Pacific knew or should have known that the McCorkles' principal source of income was the sales of the program, and not real estate dealings as falsely represented in the infomercial.

Despite the information obtained by Charter Pacific during its "due diligence" inquiry, Charter Pacific entered into a business relationship with Cashflow System, Inc. On October 16, 1996, Charter Pacific agreed to process and collect Visa and MasterCard credit card transactions involving Cashflow System, Inc.'s customers. Docket No. 849 at 66. Cashflow System, Inc. and Charter Pacific executed a Merchant Bankcard Service and Security Agreement ("Merchant–Security Agreement") that purported to describe the relationship of the parties. Specifically, Cashflow System, Inc. would accept credit cards as a method of payment for its "goods," and Charter Pacific would receive a certain percentage of each transaction that flowed through the merchant account. The arrangement was lucrative for Charter Pacific.

Charter Pacific established two types of merchant accounts for Cashflow System, Inc.—a general operating account, used to process and provide direct refunds and chargebacks to Cashflow System, Inc.'s customers, and a reserve account, set up by the bank to protect it from potential refunds and chargebacks.[6] Cashflow System, Inc. did not have access to any of the reserve accounts. Docket No. 849 at 84.

Charter Pacific was confident that it could profit from the McCorkles' massive monthly deposits without risk. The Merchant–Security Agreement dated October 16, 1996 purported to provide Charter Pacific with a security interest in all "deposits" made to any of Cashflow System, Inc.'s merchant accounts, i.e., operating and reserve accounts.[7] *See* Docket No. 832, Exhibit A at ¶ 7.14.

During the latter part of October 1996, Charter Pacific knew that the Florida At-

---

**6.** As part of its membership agreement with Visa and MasterCard, Charter Pacific is obligated to accept debits initiated by Cashflow System, Inc. Visa or MasterCard customers through their issuing bank if the customer later requests a refund. This process is called a chargeback. Pursuant to paragraph 7.1 of the Merchant–Security Agreement, the reserve accounts are funded by the deposit of a percentage from each deposit transaction. Chargebacks or fees are first charged to the merchant's operating account, and if there are insufficient funds in the operating account to cover the chargebacks and fees, then Charter has the right to withdraw funds from the reserve account to cover the deposit. Docket No. 832, Exhibit A at ¶ 7.1(b).

**7.** Section 7.14 of the Merchant–Security Agreement dated October 16, 1996, states in full:

SECURITY INTEREST IN MERCHANT BANK ACCOUNT, DEPOSIT ACCOUNTS, AND DEPOSIT ACCOUNT PROCEEDS.

To secure Merchant's liability for potential Chargebacks and any other chargers or liability of Merchant to Bank, Merchant hereby grants to Bank a security interest in all deposits, regardless of source, made to any Merchant Bank Account and any personal and business deposit accounts in the name of Merchant or Merchant's principals at any deposit institution, and in the proceeds of any of said deposits. Bank may enforce its security interest without notice or demand of any kind, by:

(a) making an immediate withdrawal from or freezing any or all of said deposit accounts; and/or

(b) taking possession of any deposits made to said accounts, upon Bank's reasonable determination that any term or condition of this Agreement has been breached; and/or

(c) taking any other lawful action by legal action or otherwise. . . .

Section 7.14 of the Merchant–Security Agreement. Docket No. 832, Exhibit A at ¶ 7.14.

torney General's office was investigating the McCorkles and their various corporations, including Cashflow System, Inc. Docket No. 849 at 69. Indeed, Charter Pacific received a subpoena for records on Cashflow from Florida Assistant Attorney General Lisa Young. Docket No. 849 at 69. Charter Pacific also knew that Texas Assistant Attorney General was investigating Cashflow System, Inc. GX 28 at 106; Docket No. 849 at 109. Despite this knowledge, Charter Pacific continued its business relationship with Cashflow System, Inc. Charter Pacific remained confident that its reserve account and "security interest" would protect it.

On May 9, 1997, the government seized all of the contents of the following Cashflow System, Inc. accounts at Charter Pacific: 1.) two operating accounts with account numbers 060–50830 (holding $13,586.66) and 060–508534 (holding $14,968.06); 2.) two reserve accounts in the form of cash with account numbers 060–207763 (holding $224,564.43) and 060–207674 ($580,080.92); and 3.) three reserve accounts in the form of CD's with account numbers 060–301015 (holding $100,070.55), 060–301018 (holding $100,980.31), and 060–301025 (holding $99,873.01). See Docket No. 849 at 31, 73–74. The seizure totaled $1,134,123.94. Charter Pacific's reserve accounts had never been seized before [see Docket No. 849 at 91] and this seizure attracted Charter Pacific's attention. At the time of the seizure, Charter Pacific knew or should of known of the government's contention that the McCorkles' business was fraudulent, as were any proceeds of Cashflow's business on deposit. Through the May 9, 1997 seizure warrant, Charter knew that the government was going to try to seize the McCorkles' and Cashflow System, Inc.'s money based on money laundering charges.

Nevertheless, Charter Pacific continued to provide merchant banking services to the McCorkles and Cashflow System, Inc. after May 9, 1997, and thus allowed Cashflow to continue to receive credit card payments from its "customers." Docket No. 849 at 83. Charter Pacific's decision to continue doing business with the McCorkles after the seizure caused it to use its own funds to pay chargebacks in the amount of $260,583.41. Docket No. 832 at 3. There were insufficient funds on deposit in the Cashflow System, Inc. operating or reserve accounts to pay such chargebacks. Docket No. 832 at 3.

On November 5, 1998, the jury found that the contents seized from the bank accounts at Charter Pacific were forfeitable to the United States because they were involved in, traceable to, or facilitated the fraud and laundering violations charged in the indictment. See Docket No. 412. As a result, a total of $1,134,123.94 was ordered forfeited to the United States pursuant to the Court's preliminary and amended orders of forfeiture. See Docket Nos. 453, 552. On March 15, 2000, Charter Pacific filed a petition claiming that it is entitled to $260,583.41 of the forfeited assets seized from Charter Pacific to reimburse Charter Pacific for the chargebacks it was required to pay to Cashflow System, Inc.'s Visa and MasterCard consumers. Docket Nos. 605 and 832. Specifically, Charter Pacific contends that it held a perfected security interest in the funds seized, which is superior to the government's unsecured interest in the funds. Docket No. 832 at 6—13. Charter Pacific also contends that it was a bona fide purchaser for value without reasonable cause to believe that the contents in the accounts were subject to forfeiture. Docket No. 832 at 13—14.

The government opposes Charter Pacific's third party petition on the grounds that, at the time the government seized the funds, Charter Pacific had neither perfected its security interest in the accounts, nor had it lost any money. After the

seizure, Charter Pacific had continued its banking relationship with Cashflow System, Inc. and the McCorkles, and subsequently lost money when refunds were not paid. Hence, the government claims that Charter Pacific cannot meet the criteria of § 853(n)(6). *See* Docket No. 605. The Court has considered the evidence, the testimony, and the relevant portions of the record in the criminal case, and finds for the government on all issues.

### 1. Application of 21 U.S.C. § 853(n)(6)(A)

In order to prevail under § 853(n)(6)(A), Charter Pacific must establish that it has a legal right, title, or interest in the seized funds that either "vested" in Charter Pacific rather than the McCorkles or Cashflow System, Inc., or was "superior" to any right, title, or interest of the McCorkles or Cashflow System, Inc "at the time of the commission of the acts which gave rise to the forfeiture." 21 U.S.C. § 853(n)(6)(A). Black's Law Dictionary 1557 (7th ed.1999) defines "vested" as "that has become a completed, consummated right for present or future enjoyment; not contingent; unconditional; absolute." *See also Campos,* 859 F.2d at 1238. Charter Pacific does not claim a vested right, title or interest in the seized funds. Rather, Charter Pacific claims that the Merchant–Security Agreement signed on October 16, 1996, provided it with a perfected security interest in the seized funds that is "superior" to any interest held by the government. *See* Docket No. 832 at 11, 594 at 11. Charter Pacific's claim is without merit.

Under the relation-back doctrine, the government acquires its interest in the defendant's forfeited property at the time of the commission of the criminal acts giving rise to the forfeiture. *See* 21 U.S.C. § 853(c).[8] Thus, if the third party's interest in the forfeited property at the time of the criminal acts was superior to the criminal defendant's interest, then the interest that the government acquires when it steps into the defendant's shoes is subordinate to that of the third party. *United States v. Lavin,* 942 F.2d 177, 185 (3rd Cir.1991).

All right, title, and interest in the fraud proceeds laundered by the McCorkles and Cashflow System, Inc. vested in the United States when the McCorkles and Cashflow System, Inc. first committed the crimes giving rise to the forfeiture. As charged in the superseding indictment, the specified unlawful activity which produced proceeds for laundering was the McCorkles' fraudulent telemarketing scheme which began on June 1, 1992, four years before the McCorkles opened their accounts with Charter Pacific, Docket No. 76, ¶ 119. The charged money laundering conspiracy, which resulted in the forfeiture of the funds held in the Charter Pacific accounts began on July 26, 1996, and continued through July 2, 1997. Docket No. 76, ¶ 111.

The superseding indictment described the manner and means by which the McCorkles carried out their money laundering conspiracy. Docket No. 76,

---

8. Section 853(c) states in full:

All right, title, and interest in property described in subsection (a) of this section vests in the United States upon the commission of the act giving rise to forfeiture under this section. Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) of this section that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(c).

¶¶ 112—163. Specifically, the McCorkles generated initial sales of their videotapes and written manuals by frequent airing of their infomercial. Docket No. 76, ¶ 114. Consumers placed orders through a toll free number and could pay for their purchases with a credit card or by C.O.D. Docket No. 76, ¶ 114. The McCorkles established a merchant agreement with Charter Pacific to be used for processing credit card purchases of the McCorkles' various programs. Superseding Indictment, Docket No. 76, ¶ 119. The McCorkles

> deposited and caused to be deposited proceeds earned from their fraudulent telemarketing operation into bank accounts; used merchant accounts of financial institutions, such as Old Kent Bank and Charter Pacific Bank, to obtain the proceeds from victims of their telemarketing scheme; and used the proceeds to pay various business operating expenses, such as employee commissions and payroll, and mail delivery services, for the promotion of the fraudulent telemarketing scheme.

Superseding Indictment, Docket No. 76, ¶ 119. The financial transactions involving the telemarketing fraud proceeds were designed to promote and conceal the proceeds of the fraud in violation of the money laundering conspiracy statute, 18 U.S.C. §§ 1956(a)(1)(A) and (B). Docket No. 76, ¶ 111.

Thus, under the "relation-back" doctrine, the government's interest in the for-

feited seized funds vested on July 26, 1996. The McCorkles committed acts in furtherance of their money laundering conspiracy that gave rise to the forfeiture of the merchant accounts beginning on July 26, 1996, before Charter Pacific obtained any interest in the seized funds. Charter Pacific did not acquire any interest Cashflow System, Inc.'s accounts until at least October 16, 1996—the date it executed the Merchant–Security Agreement. By that date, the McCorkles' infomercials were producing millions of dollars in fraud proceeds, and the conspiracy to launder that money was in full operation. The jury found that the fraudulent proceeds deposited into the Charter Pacific accounts were involved in, traceable to, or facilitated the fraud and laundering violations charged in the indictment and, thus, were subject to forfeiture. *See* Docket No. 412. Therefore, Charter Pacific's "title" to the laundered fraud proceeds was not "superior" to that of the McCorkles, Cashflow System, Inc., or the government when the criminal money laundering began on July 26, 1996.[9] Charter Pacific's claim fails under 21 U.S.C. § 853(n)(6)(A).

### 2. Application of 21 U.S.C. § 853(n)(6)(B)

This Court also rejects Charter Pacific's argument that it was a bona fide purchaser for value reasonably without cause to believe that the property was subject to forfeiture under 21 U.S.C. § 853(n)(6)(B). As a result of the due diligence inquiry performed in October 1996, Charter Pacific

---

9. Charter Pacific argues that on October 16, 1996—the date the Merchant–Security Agreement was signed, Charter Pacific held a "perfected" security interest in the funds that would later be deposited and seized on May 9, 1997. The Court disagrees. The Merchant–Security Agreement makes clear that Charter Pacific's interest attaches to "deposits." *See* Merchant–Security Agreement, Docket No. 832, Exhibit A at ¶ 7.14 ("the merchant hereby grants the Bank a security interest in all

deposits"). Pursuant to the terms of its own agreement, Charter Pacific's "interest" in the seized funds would not have arisen until the funds were deposited into the merchant accounts. The government's interest in these laundered fraud proceeds, however, had already vested prior to the deposit at the time the criminal acts giving rise to the forfeiture began, *i.e.*, July 26, 1996. The government's interest vested under 21 U.S.C. § 853(c) before the deposits were over made.

knew or should have known that: 1) the merchant account application contained false information; 2) the promise of timely refunds was a prominent part of the McCorkles' infomercial; 3) the McCorkles' principal source of income was the sale of the programs, and not real estate dealings as falsely represented in the infomercial; 4) at least one other merchant banks terminated Cashflow System, Inc.'s account due to excessive chargebacks; 5) Cashflow System, Inc. was under investigation by the Florida and Texas state governments; and 6) Cashflow's tax returns and financial statements did not reflect the sales stated in the merchant account application. Over the course of Charter Pacific's banking relationship with the McCorkles and Cashflow System, Inc., Charter Pacific had cause to believe that the proceeds of Cashflow System, Inc.'s deposits were subject to forfeiture.

Charter Pacific continued its business relationship with Cashflow System, Inc. knowing that Cashflow System, Inc. was being investigated by the federal government for money laundering. In doing so, Charter Pacific allowed more charges to be processed, and risked loss. Charter Pacific reasonably should have known that any losses it incurred post-seizure as a result of defendants' refusal or inability to cover the chargebacks, would not have been recoverable from the seized assets. Charter Pacific's petition should be **DENIED.**

## IV. *CONCLUSION*

For the foregoing reasons, it is **RECOMMENDED** that the third party petitions filed by Animal Welfare Foundation, Inc. [Docket Nos. 593, 838], United Parcel Service [Docket No. 820], and Charter Pacific Bank [Docket Nos. 594] be **DENIED.** It is

**FURTHER RECOMMENDED** that C.V. Butler Farm, Inc.'s petition for relief

from the February 5, 1999 amended forfeiture order be **GRANTED** [Docket Nos. 596 and 848] and that an order be issued amending and modifying the amended forfeiture order so as to allow C.V. Butler Farms, Inc. to recover $8,267.99 plus interest on its secured mortgage lien on the forfeited real property located at 2419 Willie N. Mays Parkway, Orlando, Florida. The parties shall file an agreed statement computing interest on or before **July 7, 2000.**

Failure to file and serve written objections to the proposed findings and recommendations in this report, pursuant to 28 U.S.C. § 636(b)(1)(B) and (e) and Local Rule 6.02, within ten days of the date of its filing shall bar an aggrieved party from a de novo determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal. Each party filing an objection to this Report and Recommendation shall cause the transcription and filing of a single transcript of the entire hearing on November 22, 2000 (costs to be shared) within twenty days of the date of this order.